401 F.2d 833
 2 A.L.R.Fed. 190
 SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellant,
v.
TEXAS GULF SULPHUR CO., a Texas Corporation, Charles F.
Fogarty, Richard D. Mollison, Walter Holyk, Kenneth H.
Darke, Francis G. Coates, Claude O. Stephens, John A.
Murray, Earl L. Huntington, and Harold B. Kline, Defendants-
Appellees.
SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellee,
v.
David M. CRAWFORD and Richard H. Clayton, Defendants-Appellants.
 No. 296, Docket 30882.
 United States Court of Appeals Second Circuit.
 Argued March 20, 1967, Submitted to in Banc Court May 2, 1968.
Decided Aug. 13, 1968.
 
 Philip A. Loomis, Jr., Gen. Counsel, David Ferber, Sol., Roger S. Foster, Sp. Counsel, Ofc. of Policy Research, SEC, Frank E. Kennamer, Jr., Asst. Gen. Counsel, Donald M. Feuerstein, Atty., SEC, for Securities and Exchange Commission.
 Orison S. Marden, White & Case, William D. Conwell, Edward C. Schmults, P. R. Konrad Knake, Thomas McGanney, Peter G. Eikenberry, New York City, for Texas Gulf Sulphur, Forgarty, Mollison, Holyk, Darke, Stephens, Murray, Huntington and Kline, for Crawford and Clayton.
 Albert R. Connelly, Donald I. Strauber, Cravath, Swaine & Moore, New York City, for Coates.
 Before LUMBARD, Chief Judge, and WATERMAN, MOORE, FRIENDLY, SMITH, KAUFMAN, HAYS, ANDERSON and FEINBERG, Circuit Judges.
 WATERMAN, Circuit Judge:
 
 
 1
 This action was commenced in the United States District Court for the Southern District of New York by the Securities and Exchange Commission (the SEC) pursuant to Sec. 21(e) of the Securities Exchange Act of 1934 (the Act), 15 U.S.C. 78u(e), against Texas Gulf Sulphur Company (TGS) and several of its officers, directors and employees, to enjoin certain conduct by TGS and the individual defendants said to violate Section 10(b) of the Act, 15 U.S.C. Section 78j(b), and Rule 10b-5 (17 CFR 240.10b-5) (the Rule), promulgated thereunder, and to compel the rescission by the individual defendants of securities transactions assertedly conducted contrary to law.[1] The complaint alleged (1) that defendants Fogarty, Mollison, Darke, Murray, Huntington, O'Neill, Clayton, Crawford, and Coates had either personally or through agents purchased TGS stock or calls thereon from November 12, 1963 through April 16, 1964 on the basis of material inside information concerning the results of TGS drilling in Timmins, Ontario, while such information remained undisclosed to the investing public generally or to the particular sellers;[2] (2) that defendants Darke and Coates had divulged such information to others for use in purchasing TGSstock or calls[3] or recommended its purchase while the information was undisclosed to the public or to the sellers;[4] that defendants Stephens, Fogarty, Mollison, Holyk, and Kline had accepted options to purchase TGS stock on Feb. 20, 1964 without disclosing the material information as to the drilling progress to either the Stock Option Committee or the TGS Board of Directors; and (4) that TGS issued a deceptive press release on April 12, 1964. The case was tried at length before Judge Bonsal of the Southern District of New York, sitting without a jury. Judge Bonsal in a detailed opinion[5] decided, inter alia, that the insider activity prior to April 9, 1964 was not illegal because the drilling results were not 'material' until then; that Clayton and Crawford had traded in violation of law because they traded after that date; that Coates had committed no violation as he did not trade before disclosure was made; and that the issuance of the press release was not unlawful because it was not issued for the purpose of benefiting the corporation, there was no evidence that any insider used the release to his personal advantage and it was not 'misleading, or deceptive on the basis of the facts then known,' 258 F.Supp. 262, at 292-296 (SDNY 1966). Defendants Clayton and Crawford appeal from that part of the decision below which held that they had violated Sec. 10 (b) and Rule 10b-5 and the SEC appeals from the remainder of the decision which dismissed the complaint against defendants TGS, Fogarty, Mollison, Holyk, Darke, Stephens, Kline, Murray, and Coates.[6]
 
 
 2
 For reasons which appear below, we decide the various issues presented as follows:
 
 
 3
 (1) As to Clayton and Crawford, as purchasers of stock on April 15 and 16, 1964, we affirm the finding that they violated 15 U.S.C. 78j(b) and Rule 10b-5 and remand, pursuant to the agreement by all the parties, for a determination of the appropriate remedy.
 
 
 4
 (2) As to Murray, we affirm the dismissal of the complaint.
 
 
 5
 (3) As to Mollison and Holyk, as recipients of certain stock options, we affirm the dismissal of the complaint.
 
 
 6
 (4) As to Stephens and Fogarty, as recipients of stock options, we reverse the dismissal of the complaint and remand for a further determination as to whether an injunction, in the exercise of the trial court's discretion, should issue.
 
 
 7
 (5) As to Kline, as a recipient of a stock option, we reverse the dismissal of the complaint and remand with directions to issue an order rescinding the option and for a determination of any other appropriate remedy in connection therewith.
 
 
 8
 (6) As to Fogarty, Mollison, Holyk, Darke, and Huntington, as purchasers of stock or calls thereon between Novermber 12, 1963, and April 9, 1964, we reverse the dismissal of the complaint and find that they violated 15 U.S.C. 78j(b) and Rule 10b-5, and remand, pursuant to the agreement of all the parties, for a determination of the appropriate remedy.
 
 
 9
 (7) As to Clayton, although the district judge did not specify that the complaint be dismissed with respect to his purchases of TGS stock before April 9, 1964, such a dismissal is implicit in his treatment of the individual appellees who acted similarly. Consequently, although Clayton is named only as an appellant our decision with respect to the materiality of K-55-1 renders it necessary to treat him also as an appellee. Thus, as to him, as one who purchased stock between November 12, 1963 and April 9, 1964, we reverse the implicit dismissal of the complaint, find that he violated 78j(b) and Rule 10b-5, and remand, pursuant to the agreement by all the parties, for a determination of the appropriate remedy.
 
 
 10
 (8) As to Darke, as one who passed on information to tippees, we reverse the dismissal of the complaint and remand, pursuant to the agreement by all the parties, for a determination of the appropriate remedy.
 
 
 11
 (9) As to Coates, as one who on April 16th purchased stock and gave information on which his son-in-law broker and the broker's customers purchased shares, we reverse the dismissal of the complaint, find that he violated 15 U.S.C. 78j(b) and Rule 10b-5, and remand, pursuant to the agreement by all the parties, for a determination of the appropriate remedy.
 
 
 12
 (10) As to Texas Gulf Sulphur, we reverse the dismissal of the complaint and remand for a further determination by the district judge in the light of the approach taken in this opinion.
 
 
 13
 The occurrences out of which this litigation arose are not set forth hereafter in as detailed a manner as they are set out in the published opinion of the court below, but are stated sufficiently, we believe, for the exposition of the issues raised by the several appeals to us.
 
 THE FACTUAL SETTING
 
 14
 This action derives from the exploratory activities of TGS begun in 1957 on the Canadian Shield in eastern Canada. In March of 1959, aerial geophysical surveys were conducted over more than 15,000 square miles of this area by a group led by defendant Mollision, a mining engineer and a Vice President of TGS. The group included defendant Holyk, TGS's chief geologist, defendant Clayton, an electrical engineer and geophysicist, and defendant Darke, a geologist. These operations resulted in the detection of numerous anomalies, i.e., extraordinary variations in the conductivity of rocks, one of which was on the Kidd 55 segment of land located near Timmins, Ontario.
 
 
 15
 On October 29 and 30, 1963, Clayton conducted a ground geophysical survey on the northeast portion of the Kidd 55 segment which confirmed the presence of an anomaly and indicated the necessity of diamond core drilling for further evaluation. Drilling of the initial hole, K-55-1, at the strongest part of the anomaly was commenced on November 8 and terminated on November 12 at a depth of 655 feet. Visual estimates by Holyk of the core of K-55-1 indicated an average copper content of 1.15% And an average zinc content of 8.64% Over a length of 599 feet. This visual estimate convinced TGS that it was desirable to acquire the remainder of the Kidd 55 segment, and in order to facilitate this acquisition TGS President Stephens instructed the exploration group to keep the results of K-55-1 confidential and undisclosed even as to other officers, directors, and employees of TGS. The hole was concealed and a barren core was intentionally drilled off the anomaly. Meanwhile, the core of K-55-1 had been shipped to Utah for chemical assay which, when received in early December, revealed an average mineral content of 1.18% Copper, 8.26% Zinc, and 3.94% Ounces of silver per ton over a length of 602 feet. These results were so remarkable that neither Clayton, an experienced geophysicist, nor four other TGS expert witnesses, had ever seen or heard of a comparable initial exploratory drill hole in a base metal deposit. So, the trial court concluded, 'There is no doubt that the drill core of K-55-1 was unusually good and that it excited the interest and speculation of those who knew about it.' Id. at 282. By March 27, 1964, TGS decided that the land acquisition program had advanced to such a point that the company might well resume drilling, and drilling was resumed on March 31.
 
 
 16
 During this period, from November 12, 1963 when K-55-1 was completed, to March 31, 1964 when drilling was resumed, certain of the individual defendants listed in fn. 2, supra, and persons listed in fn. 4, supra, said to have received 'tips' from them, purchased TGS stock or calls thereon. Prior to these transactions these persons had owned 1135 shares of TGS stock and possessed no calls; thereafter they owned a total of 8235 shares and possessed 12,300 calls.
 
 
 17
 On February 20, 1964, also during this period, TGS issued stock options to 26 of its officers and employees whose salaries exceeded a specified amount, five of whom were the individual defendants Stephens, Fogarty, Mollison, Holyk, and Kline. Of these, only Kline was unaware of the detailed results of K-55-1, but he, too, knew that a hole containing favorable bodies of copper and zinc ore had been drilled in Timmins. At this time, neither the TGS Stock Option Committee nor its Board of Directors had been informed of the results of K-55-1, presumably because of the pending land acquisition program which required confidentiality. All of the foregoing defendants accepted the options granted them.
 
 
 18
 When drilling was resumed on March 31, hole K-55-3 was commenced 510 feet west of K-55-1 and was drilled easterly at a 45 degrees angle so as to cross K-55-1 in a vertical plane. Daily progress reports of the drilling of this hole K-55-3 and of all subsequently drilled holes were sent to defendants Stephens and Fogarty (President and Executive Vice President of TGS) by Holyk and Mollison. Visual estimates of K-55-3 revealed an average mineral content of 1.12% Copper and 7.93% Zinc over 641 of the hole's 876-foot length. On April 7, drilling of a third hole, K-55-4, 200 feet south of and parallel to K-55-1 and westerly at a 45 degrees angle, was commenced and mineralization was encountered over 366 of its 579-foot length. Visual estimates indicated an average content of 1.14% Copper and 8.24% Zinc. Like K-55-1, both K-55-3 and K-55-4 established substantial copper mineralization on the eastern edge of the anomaly. On the basis of these findings relative to the foregoing drilling results, the trial court concluded that the vertical plane created by the intersection of K-55-1 and K-55-3, which measured at least 350 feet wide by 500 feet deep extended southward 200 feet to its intersection with K-55-4, and that 'There was real evidence that a body of commercially mineable ore might exist.' Id. at 281-82.
 
 
 19
 On April 8 TGS began with a second drill rig to drill another hole, K-55-6, 300 feet easterly of K-55-1. This hole was drilled westerly at an angle of 60 degrees and was intended to explore mineralization beneath K-55-1. While no visual estimates of its core were immediately available, it was readily apparent by the evening of April 10 that substantial copper mineralization had been encountered over the last 127 feet of the hole's 569-foot lenght. On April 10, a third drill rig commenced drilling yet another hole, K-55-5, 200 feet north of K-55-1, parallel to the prior holes, and slanted westerly at a 45 degrees angle. By the evening of April 10 in this hole, too, substantial copper mineralization had been encountered over the last 42 feet of its 97-foot length.
 
 
 20
 Meanwhile, remors that a major ore strike was in the making had been circulating throughout Canada. On the morning of Saturday, April 11, Stephens at his home in Greenwich, Conn. read in the New York Herald Tribune and in the New York Times unauthorized reports of the TGS drilling which seemed to infer a rich strike from the fact that the drill cores had been flown to the United States for chemical assay. Stephens immediately contacted Fogarty at his home in Rye, N.Y., who in turn telephoned and later that day visited Mollison at Mollison's home in Greenwich to obtain a current report and evaluation of the drilling progress.[7] The following morning, Sunday, Fogarty again telephoned Mollison, inquiring whether Mollison had any further information and told him to return to Timmins with Holyk, the TGS Chief Geologist, as soon as possible 'to move things along.' With the aid of one Carroll, a public relations consultant, Fogarty drafted a press release designed to quell the remors, which release, After having been channeled through Stephens and Huntington, a TGS attorney, was issued at 3:00 P.M. on Sunday, April 12, and which appeared in the morning newspapers of general circulation on Monday, April 13. It read in pertinent part as follows:
 
 
 21
 NEW YORK, April 12-- The following statement was made today by Dr. Charles F. Fogarty, executive vice president of Texas Gulf Sulphur Company, in regard to the company's drilling operations near Timmins, Ontario, Canada. Dr. Fogarty said:
 
 
 22
 'During the past few days, the exploration activities of Texas Gulf Sulphur in the area of Timmins, Ontario, have been widely reported in the press, coupled with rumors of a substantial copper discovery there. These reports exaggerate the scale of operations, and mention plans and statistics of size and grade of ore that are without factual basis and have evidently originated by speculation of people not connected with TGS.
 
 
 23
 'The facts are as follows. TGS has been exploring in the Timmins area for six years as part of its overall search in Canada and elsewhere for various minerals-- lead, copper, zinc, etc. During the course of this work, in Timmins as well as in Eastern Canada, TGS has conducted exploration entirely on its own, without the participation by others. Numerous prospects have been investigated by geophysical means and a large number of selected ones have been core-drilled. These cores are sent to the United States for assay and detailed examination as a matter of routine and on advice of expert Canadian legal counsel. No inferences as to grade can be drawn from this procedure.
 
 
 24
 'Most of the areas drilled in Eastern Canada have revealed either barren pyrite or graphite without value; a few have resulted in discoveries of small or marginal sulphide ore bodies.
 
 
 25
 'Recent drilling on one property near Timmins has led to preliminary indications that more drilling would be required for proper evaluation of this prospect. The drilling done to date has not been conclusive, but the statements made by many outside quarters are unreliable and include information and figures that are not available to TGS.
 
 
 26
 'The work done to date has not been sufficient to reach definite conclusions and any statement as to size and grade of ore would be premature and possibly misleading. When we have progressed to the point where reasonable and logical conclusions can be made, TGS will issue a definite statement to its stockholders and to the public in order to clarify the Timmins project.'
 
 
 27
 The release purported to give the Timmins drilling results as of the release date, April 12. From Mollison Fogarty had been told of the developments through 7:00 P.M. on April 10, and of the remarkable discoveries made up to that time, detailed supra, which discoveries, according to the calculations of the experts who testified for the SEC at the hearing, demonstrated that TGS had already discovered 6.2 to 8.3 million tons of proven ore having gross assay values from $26 to $29 per ton. TGS experts, on the other hand, denied at the hearing that proven or probable ore could have been calculated on April 11 or 12 because there was then no assurance of continuity in the mineralized zone.
 
 
 28
 The evidence as to the effect of this release on the investing public was equivocal and less than abundant. On April 13 the New York Herald Tribune in an article head-noted 'Copper Rumor Deflated' quoted from the TGS release of April 12 and backtracked from its original April 11 report of a major strike but nevertheless inferred from the TGS release that 'recent mineral exploratory activity near Timmins, Ontario, has provided preliminary favorable results, sufficient at least to require a step-up in drilling operations.' Some witnesses who testified at the hearing stated that they found the release encouraging. On the other hand, a Canadian mining security specialist, Roche, stated that 'earlier in the week (before April 16) we had a Dow Jones saying that they (TGS) didn't have anything basically' and a TGS stock specialist for the Midwest Stock Exchange became concerned about his long position in the stock after reading the release. The trial court stated only that 'While, in retrospect, the press release may appear gloomy or incomplete, this does not make it misleading or deceptive on the basis of the facts then known.' Id. at 296.
 
 
 29
 Meanwhile, drilling operations continued. By morning of April 13, in K-55-5, the fifth drill hole, substantial copper mineralization had been encountered to the 580 foot mark, and the hole was subsequently drilled to a length of 757 feet without further results. Visual estimates revealed an average content of 0.82% Copper and 4.2% Zinc over a 525-foot section. Also by 7:00 A.M. on April 13, K-55-6 had found mineralization to the 946-foot mark. On April 12 a fourth drill rig began to drill K-55-7, which was drilled westerly at a 45 degrees angle, at the eastern edge of the anomaly. The next morning the 137 foot mark had been reached, fifty feet of which showed mineralization. By 7:00 P.M. on April 15, the hole had been completed to a length of 707 feet but had only encountered additional mineralization during a 26-foot length between the 425 and 451-foot marks. A mill test hole, K-55-8, had been drilled and was complete by the evening of April 13 but its mineralization had not been reported upon prior to April 16. K-55-10 was drilled westerly at a 45 degrees angle commencing April 14 and had encountered mineralization over 231 of its 249-foot length by the evening of April 15. It, too, was drilled at the anomaly's eastern edge.
 
 
 30
 While drilling activity ensued to completion, TGC officials were taking steps toward ultimate disclosure of the discovery. On April 13, a previously-invited reporter for The Northern Miner, a Canadian mining industry journal, visited the drillsite, interviewed Mollison, Holyk and Darke, and prepared an article which confirmed a 10 million ton ore strike. This report, after having been submitted to Mollison and returned to the reporter unamended on April 15, was published in the April 16 issue. A statement relative to the extent of the discovery, in substantial part drafted by Mollison, was given to the Ontario Minister of Mines for release to the Canadian media. Mollison and Holyk expected it to be released over the airways at 11 P.M. on April 15th, but, for undisclosed reasons, it was not released until 9:40 A.M. on the 16th. An official detailed statement, announcing a strike of at least 25 million tons of ore, based on the drilling data set forth above, was read to representatives of American financial media from 10:00 A.M. to 10:10 or 10:15 A.M. on April 16, and appeared over Merrill Lynch's private wire at 10:29 A.M. and, somewhat later than expected, over the Dow Jones ticker tape at 10:54 A.M.
 
 
 31
 Between the time the first press release was issued on April 12 and the dissemination of the TGS official announcement on the morning of April 16, the only defendants before us on appeal who engaged in market activity were Clayton and Crawford and TGS director Coates. Clayton ordered 200 shares of TGS stock through his Canadian broker on April 15 and the order was executed that day over the Midwest Stock Exchange. Crawford ordered 300 shares at midnight on the 15th and another 300 shares at 8:30 A.M. the next day, and these orders were executed over the Midwest Exchange in Chicago at its opening on April 16. Coates left the TGS press conference and called his broker son-in-law Haemisegger shortly before 10:20 A.M. on the 16th and ordered 2,000 shares of TGS for family trust accounts of which Coates was a trustee but not a beneficiary; Haemisegger executed this order over the New York and Midwest Exchanges, and he and his customers purchased 1500 additional shares.
 
 
 32
 During the period of drilling in Timmins, the market price of TGS stock fluctuated but steadily gained overall. On Friday, November 8, when the drilling began, the stock closed at 17 3/8; on Friday, November 15, after K-55-1 had been completed, it closed at 18. After a slight decline to 16 3/8 by Friday, November 22, the price rose to 20 7/8 by December 13, when the chemical assay results of K-55-1 were received, and closed at a high of 24 1/8 on February 21, the day after the stock options had been issued. It had reached a price of 26 by March 31, after the land acquisition program had been completed and drilling had been resumed, and continued to ascend to 30 1/8 by the close of trading on April 10, at which time the drilling progress up to then was evaluated for the April 12th press release. On April 13, the day on which the April 12 release was disseminated, TGS opened at 30 1/8, rose immediately to a high of 32 and gradually tapered off to close at 30 7/8. It closed at 30 1/4 the next day, and at 29 3/8 on April 15. On April 16, the day of the official announcement of the Timmins discovery, the price climbed to a high of 37 and closed at 36 3/8. By May 15, TGS stock was selling at 58 1/4.
 
 I. THE INDIVIDUAL DEFENDANTS
 A. Introductory
 
 33
 Rule 10b-5, 17 CFR 240.10b-5, on which this action is predicated, provides:
 
 
 34
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
 
 
 35
 (1) to employ any device, scheme, or artifice to defraud,
 
 
 36
 (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 
 
 37
 (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
 
 
 38
 Rule 10b-5 was promulgated pursuant to the grant of authority given the SEC by Congress in Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b).[8] By that Act Congress purposed to prevent inequitable and unfair practices and to insure fairness in securities transactions generally, whether conducted face-to-face, over the counter, or on exchanges, see 3 Loss, Securities Regulation 1455-56 (2d ed. 1961). The Act and the Rule apply to the transactions here, all of which were consummated on exchanges. See List v. Fashion Park, Inc., 340 F.2d 457, 461-62 (2 Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965); Cochran v. Channing Corp., 211 F.Supp. 239, 243 (SDNY 1962). Whether predicated on traditional fiduciary concepts, see, e.g., Hotchkiss v. Fisher,136 Kan. 530, 16 P.2d 531 (Kan.1932), or on the 'special facts' doctrine, see, e.G., Strong v. Repide, 213 U.S. 419, 29 S.Ct. 521, 53 L.Ed. 853 (1909), the Rule is based in policy on the justifiable expectation of the securities marketplace that all investors trading on impersonal exchanges have relatively equal access to material information, see Cary, Insider Trading in Stocks, 21 Bus.Law. 1009, 1010 (1966), Fleischer, Securities Trading and Corporation Information Practices: The Implications of the Texas Gulf Sulphur Proceeding, 51 Va.L.Rev. 1271, 1278-80 (1965). The essence of the Rule is that anyone who, trading for his own account in the securities of a corporation has 'access, directly or indirectly, to information intended to be available only for a corporate purpose and not for the personal benefit of anyone' may not take 'advantage of such information knowing it is unavailable to those with whom he is dealing,' i.E., the investing public. Matter of Cady, Roberts & Co., 40 SEC 907, 912 (1961). Insiders, as directors or management officers are, of course, by this Rule, precluded from so unfairly dealing, but the Rule is also applicable to one possessing the information who may not be strictly termed an 'insider' within the meaning of Sec. 16(b) of the Act. Cady, Roberts, supra. Thus, anyone in possession of material inside information must either disclose it to the investing public, or, if he is disabled from disclosing it in order to protect a corporate confidence, or he chooses not to do so, must abstain from trading in or recommending the securities concerned while such inside information remains undisclosed. So, it is here no justification for insider activity that disclosure was forbidden by the legitimate corporate objective of acquiring options to purchase the land surrounding the exploration site; if the information was, as the SEC contends, material,[9] its possessors should have kept out of the market until disclosure was accomplished. Cady, Roberts, supra at 911.
 
 B. Material Inside Information
 
 39
 An insider is not, of course, always foreclosed from investing in his own company merely because he may be more familiar with company operations than are outside investors. An insider's duty to disclose information or his duty to abstain from dealing in his company's securities arises only in 'those situations which are essentially extraordinary in nature and which are reasonably certain to have a substantial effect on the market price of the security if (the extraordinary situation is) disclosed.' Fleischer, Securities Trading and Corporate Information Practices: The Implications of the Texas Gulf Sulphur Proceeding, 51 Va.L.Rev. 1271, 1289.
 
 
 40
 Nor is an insider obligated to confer upon outside investors the benefit of his superior financial or other expert analysis by disclosing his educated guesses or predictions. 3 Loss, op. cit. supra at 1463. The only regulatory objective is that access to material information be enjoyed equally, but this objective requires nothing more than the disclosure of basic facts so that outsiders may draw upon their own evaluative expertise in reaching their own investment decisions with knowledge equal to that of the insiders.
 
 
 41
 This is not to suggest, however, as did the trial court, the 'the test of materiality must necessarily be a conservative one, particularly since many actions under Section 10(b) are brought on the basis of hindsight,'258 F.Supp. 262 at 280, in the sense that the materialith of facts is to be assessed solely by measuring the effect the knowledge of the facts would have upon prudent or conservative investors. As we stated in List v. Fashion Park, Inc., 340 F.2d 457, 462, 'The basic test of materiality * * * is whether a reasonable man would attach importance * * * in determining his choice of action in the transaction in question. Restatement, Torts 538(2)(a); accord Prosser, Torts 554-55; I Harper & James, Torts 565-66.' This, of course, encompasses any fact '* * * which in reasonable and objective contemplation might affect the value of the corporation's stock or securities * * *.' List v. Fashion Park, Inc., supra at 462, quoting from Kohler v. Kohler Co., 319 F.2d 634, 642, 7 A.L.R.3d 486 (7 Cir. 1963). Such a fact is a material fact and must be effectively disclosed to the investing public prior to the commencement of insider trading in the corporation's securities. The speculators and chartists of Wall and Bay Streets are also 'reasonable' investors entitled to the same legal protection afforded conservative traders.[10] Thus, material facts include not only information disclosing the earnings and distributions of a company but also those facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities.
 
 
 42
 In each case, then, whether facts are material within Rule 10b-5 when the facts relate to a particular event and are undisclosed by those persons who are knowledgeable thereof will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity. Here, notwithstanding the trial court's conclusion that the results of the first drill core, K-55-1, were 'too 'remote' * * * to have had any significant impact on the market, i.e., to be deemed material,'[11] 258 F.Supp. at 283, knowledge of the possibility, which surely was more than marginal, of the existence of a mine of the vast magnitude indicated by the remarkably rich drill core located rather close to the surface (suggesting mineability by the less expensive openpit method) within the confines of a large anomaly (suggesting an extensive region of mineralization) might well have affected the price of TGS stock and would certainly have been an important fact to a reasonable, if speculative, investor in deciding whether he should buy, sell, or hold. After all, this first drill core was 'unusually good and * * * excited the interest and speculation of those who knew about it.' 258 F.Supp. at 282.
 
 
 43
 Our disagreement with the district judge on the issue does not, then, go to his findings of basic fact, as to which the 'clearly erroneous' rule would apply, but to his understanding of the legal standard applicable to them. See Baranow v. Gibralter Factors Corp., 366 F.2d 584, 587-589 (2 Cir. 1966), and cases cited in footnote 11 supra. Our survey of the facts found below conclusively establishes that knowledge of the results of the discovery hole, K-55-1, would have been important to a reasonable investor and might have affected the price of the stock.[12] On April 16, The Northern Miner, a trade publication in wide circulation among mining stock specialists, called K-55-1, the discovery hole, 'one of the most impressive drill holes completed in modern times.'[13] Roche, a Canadian broker whose firm specialized in mining securities, characterized the importance to investors of the results of K-55-1. He stated that the completion of 'the first drill hole' with 'a 600 foot drill core is very very significant * * * anything over 200 feet is considered very significant and 600 feet is just beyond your wildest imagination.' He added, however, that it 'is a natural thing to buy more stock once they give you the first drill hole.' Additional testimony revealed that the prices of stocks of other companies, albeit less diversified, smaller firms, had increased substantially solely on the basis of the discovery of good anomalies or even because of the proximity of their lands to the situs of a potentially major strike.
 
 
 44
 Finally, a major factor in determining whether the K-55-1 discovery was a material fact is the importance attached to the drilling results by those who knew about it. In view of other unrelated recent developments favorably affecting TGS, participation by an informed person in a regular stock-purchase program, or even sporadic trading by an informed person, might lend only nominal support to the inference of the materiality of the K-55-1 discovery; nevertheless, the timing by those who knew of it of their stock purchases and their purchases of short-term calls-- purchases in some cases by individuals who had never before purchased calls or even TGS stock-- virtually compels the inference that the insiders were influenced by the drilling results. This insider trading activity, which surely constitutes highly pertinent evidence and the only truly objective evidence of the materiality of the K-55-1 discovery, was apparently disregarded by the court below in favor of the testimony of defendants' expert witnesses, all of whom 'agreed that one drill core does not establish an ore body, much less a mine,' 258 F.Supp. at 282-283. Significantly, however, the court below, while relying upon what these defense experts said the defendant insiders ought to have thought about the worth to TGS of the K-55-1 discovery, and finding that from November 12, 1963 to April 6, 1964 Fogarty, Murray, Holyk and Darke spent more than $100,000 in purchasing TGS stock and calls on that stock, made no finding that the insiders were motivated by any factor other than the extraordinary K-55-1 discovery when they bought their stock and their calls. No reason appears why outside investors, perhaps better acquainted with speculative modes of investment and with, in many cases, perhaps more capital at their disposal for intelligent speculation, would have been less influenced, and would not have been similarly motivated to invest if they had known what the insider investors knew about the K-55-1 discovery.
 
 
 45
 Our decision to expand the limited protection afforded outside investors by the trial court's narrow definition of materiality is not at all shaken by fears that the elimination of insider trading benefits will deplete the ranks of capable corporate managers by taking away an incentive to accept such employment. Such benefits, in essence, are forms of secret corporate compensation, see Cary, Corporate Standards and Legal Rules, 50 Calif.L.Rev. 408, 409-10 (1962), derived at the expense of the uninformed investing public and not at the expense of the corporation which receives the sole benefit from insider incentives. Moreover, adequate incentives for corporate officers may be provided by properly administered stock options and employee purchase plans of which there are many in existence. In any event, the normal motivation induced by stock ownership, i.e., the identification of an individual with corporate progress, is ill-promoted by condoning the sort of speculative insider activity which occurred here; for example, some of the corporation's stock was sold at market in order to purchase short-term calls upon that stock, calls which would never be exercised to increase a stockholder equity in TGS unless the market price of that stock rose sharply.
 
 
 46
 The core of Rule 10b-5 is the implementation of the Congressional purpose that all investors should have equal access to the rewards of participation in securities transactions. It was the intent of Congress that all members of the investing public should be subject to identical market risks,-- which market risks include, of course the risk that one's evaluative capacity or one's capital available to put at risk may exceed another's capacity or capital. The insiders here were not trading on an equal footing with the outside investors. They alone were in a position to evaluate the probability and magnitude of what seemed from the outset to be a major ore strike; they alone could invest safely, secure in the expectation that the price of TGS stock would rise substantially in the event such a major strike should materialize, but would decline little, if at all, in the event of failure, for the public, ignorant at the outset of the favorable probabilities would likewise be unaware of the unproductive exploration, and the additional exploration costs would not significantly affect TGS market prices. Such inequities based upon unequal access to knowledge should not be shrugged off as inevitable in our way of life, or, in view of the congressional concern in the area, remain uncorrected.
 
 
 47
 We hold, therefore, that all transactions in TGS stock or calls by individuals apprised of the drilling results[14] of K-55-1 were made in violation of Rule 10b-5.[15] Inasmuch as the visual evaluation of that drill core (a generally reliable estimate though less accurate than a chemical assay) constituted material information, those advised of the results of the visual evaluation as well as those informed of the chemical assay traded in violation of law. The geologist Darke possessed undisclosed material information and traded in TGS securities. Therefore we reverse the dismissal of the action as to him and his personal transactions. The tril court also found, 258 F.Supp. at 284, that Darke, after the drilling of K-55-1 had been completed and with detailed knowledge of the results thereof, told certain outside individuals that TGS 'was a good buy.' These individuals thereafter acquired TGS stock and calls. The trial court also found that later, as of March 30, 1964, Darke not only used his material knowledge for his own purchases but that the substantial amounts of TGS stock and calls purchased by these outside individuals on that day, see footnote 4, supra, was 'strong circumstantial evidence that Darke must have passed the word to one or more of his 'tippees' that drilling on the Kidd 55 segment was about to be resumed.' 258 F.Supp. at 284. Obviously if such a resumption were to have any meaning to such 'tippees,' they must have previously been told of K-55-1.
 
 
 48
 Unfortunately, however, there was no definitive resolution below of Darke's liability in these premises for the trial court held as to him, as it held as to all the other individual defendants, that this 'undisclosed information' never became material until April 9. As it is our holding that the information acquired after the drilling of K-55-1 was material, we, on the basis of the findings of direct and circumstantial evidence on the issue that the trial court has already expressed, hold that Darke violated Rule 10b-5(3) and Section 10(b) by 'tipping' and we remand, pursuant to the agreement of the parties, for a determination of the appropriate remedy.[16] As Darke's 'tippees' are not defendants in this action, we need not decide whether, if they acted with actual or constructive knowledge that the material information was undisclosed, their conduct is as equally violative of the Rule as the conduct of their insider source, though we note that it certainly could be equally reprehensible.
 
 
 49
 With reference to Huntington, the trial court found that he 'had no detailed knowledge as to the work' on the Kidd-55 segment, 258 F.Supp. 281. Nevertheless, the evidence shows that he knew about and participated in TGS's land acquisition program which followed the receipt of the K-55-1 drilling results, and that on February 26, 1964 he purchased 50 shares of TGS stock. Later, on March 16, he helped prepare a letter for Dr. Holyk's signature in which TGS made a substantial offer for lands near K-55-1, and on the same day he, who had never before purchased calls on any stock, purchased a call on 100 shares of TGS stock. We are satisfied that these purchases in February and March, coupled with his readily inferable and probably reliable, understanding of the highly favorable nature of preliminary operations on the Kidd segment, demonstrate that Huntington possessed material inside information such as to make his purchase violative of the Rule and the Act.
 
 
 50
 C. When May Insiders Act?
 
 
 51
 Appellant Crawford, who ordered[17] the purchase of TGS stock shortly before the TGS April 16 official announcement, and defendant Coates, who placed orders with and communicated the news to his broker immediately after the official announcement was read at the TGS-called press conference, concede that they were in possession of material information. They contend, however, that their purchases were not proscribed purchases for the news had already been effectively disclosed. We disagree.
 
 
 52
 Crawford telephoned his orders to his Chicago broker about midnight on April 15 and again at 8:30 in the morning of the 16th, with instructions to buy at the opening of the Midwest Stock Exchange that morning. The trial court's finding that 'he sought to, and did, 'beat the news," 258 F.Supp. at 287, is well documented by the record. The rumors of a major ore strike which had been circulated in Canada and, to a lesser extent, in New York, had been disclaimed by the TGS press release of April 12, which significantly promised the public an official detailed announcement when possibilities had ripened into actualities. The abbreviated announcement to the Canadian press at 9:40 A.M. on the 16th by the Ontario Minister of Mines and the report carried by The Northern Miner, parts of which had sporadically reached New York on the morning of the 16th through reports from Canadian affiliates to a few New York investment firms, are assuredly not the equivalent of the official 10-15 minute announcement which was not released to the American financial press until after 10:00 A.M. Crawford's orders had been placed before that. Before insiders may act upon material information, such information must have been effectively disclosed in a manner sufficient to insure its availibility to the investing public. Particularly here, where a formal announcement to the entire financial news media had been promised in a prior official release known to the media, all insider activity must await dissemination of the promised official announcement.
 
 
 53
 Coates was absolved by the court below because his telephone order was placed shortly before 10:20 A.M. on April 16, which was after the announcement had been made even though the news could not be considered already a matter of public information. 258 F.Supp. at 288. This result seems to have been predicated upon a misinterpretation of dicta in Cady, Roberts, where the SEC instructed insiders to 'keep out of the market until the established procedures for public release of the information are carried out instead of hastening to execute transactions in advance of, and in frustration of, the objectives of the release,' 40 SEC at 915. The reading of a news release, which prompted Coates into action, is merely the first step in the process of dissemination required for compliance with the regulatory objective of providing all investors with an equal opportunity to make informed investment judgments. Assuming that the contents of the official release could instantaneously be acted upon,[18] at the minimum Coates should have waited until the news could reasonably have been expected to appear over the media of widest circulation, the Dow Jones broad tape, rather than hastening to insure an advantage to himself and his broker son-in-law.[19]
 
 
 54
 D. Is An Insider's Good Faith A Defense Under 10b-5?
 
 
 55
 Coates, Crawford and Clayton, who ordered purchases before the news could be deemed disclosed, claim, nevertheless, that they were justified in doing so because they honestly believed that the news of the strike had become public at the time they placed their orders. However, whether the case before us is treated solely as an SEC enforcement proceeding or as a private action,[20] proof of a specific intent to defraud is unnecessary. In an enforcement proceeding for equitable or prophylactic relief, the common law standard of deceptive conduct has been modified in the interests of broader protection for the investing public so that negligent insider conduct has become unlawful. See Berko v. SEC, 316 F.2d 137, 141-142 (2 Cir. 1963); SEC v. Capital Gains, etc., Bureau, 375 U.S. 180, 193, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). A similar standard has been adopted in private actions, see, e.g., Stevens v. Vowell, 343 F.2d 374 (10 Cir. 1965); Ellis v. Carter, 291 F.2d 270 (9 Cir. 1961); Royal Air Properties, Inc. v. Smith, 312 F.2d 210 (9 Cir. 1962); Dack v. Shanman, 227 F.Supp. 26 (SDNY 1964); but see, e.g., Weber v. C.M.P. Corp., 242 F.Supp. 321 (SDNY 1965); Thiele v. Shields, 131 F.Supp. 416 (SDNY 1955), for policy reasons which seem perfectly consistent with the broad Congressional design '* * * to insure the maintenance of fair and honest markets in * * * (securities) transactions.' Sec. 2 of SEC Act, 15 U.S.C. 78b, see Kohler v. Kohler Co., 319 F.2d 634, 642 (7 Cir. 1963); Note, 32 U.Chi.L.Rev. 824, 839-44 (1965); Note, 63 Mich.L.Rev. 1070, 1079-81 (1965).
 
 
 56
 Absent any clear indication of a legislative intention to require a showing of specific fraudulent intent, see Note, 63 Mich.L.Rev. 1070, 1075, 1076 n. 29 (1965), the securities laws should be interpreted as an expansion of the common law[21] both to effectuate the broad remedial design of Congress, see SEC v. Capital Gains Research Bureau, supra, 375 U.S. at 195,84 S.Ct. 275, and to insure uniformity of enforcement, see Note, 32 U.Chi.L.Rev. 824, 832 n. 36 (1965), citing McClure v. Borne Chemical Co.,292 F.2d 824, 834 (3 Cir. 1961). Moreover, a review of other sections of the Act from which Rule 10b-5 seems to have been drawn suggests that the implementation of a standard of conduct that encompasses negligence as well as active fraud comports with the administrative and the legislative purposes underlying the Rule.[22] Finally, we note that this position is not, as asserted by defendants, irreconcilable with previous language in this circuit because 'some form of the traditional scienter requirement,' Barnes v. Osofsky, 373 F.2d 269, 272 (2 Cir. 1967), sometimes defined as 'fraud,' Fischman v. Raytheon Mfg. Co., 9 F.R.D. 707 (SDNY 1949), rev'd on other grounds, 188 F.2d 783, 786 (2 Cir. 1951) is preserved. This requirement, whether it be termed lack of diligence, constructive fraud, or unreasonable or negligent conduct, remains implicit in this standard, a standard that promotes the deterrence objective of the Rule.
 
 
 57
 Thus, the beliefs of Coates, Crawford and Clayton that the news of the ore strike was sufficiently public at the time of their purchase orders are to no avail if those beliefs were not reasonable under the circumstances. Crawford points to the scattered rumors of the discovery which had been circulating for some time before April 15, to the release of the information to The Northern Miner on April 15 to be published by it on the 16th, to the arrangement made by TGS with the Ontario Minister of Mines for the release of an abbreviated report on the evening of the 15th (which did not eventuate until 9:40 A.M., April 16), and to the corporation's official announcement at 10:00 A.M. on the 16th, all of which transpired prior to an anticipated execution of his purchase orders that had been placed by him after trading had closed on the Midwest Exchange on April 15. However, the rumors and casual disclosure through Canadian media, especially in view of the April 12 'gloomy' or incomplete release denying the rumors and promising official confirmation, hardly sufficed to inform traders on American exchanges affected by Crawford's purchases. Moreover, the formal announcement could not reasonably have been expected to be disseminated by the time of the opening of the exchanges on the morning of April 16, when Crawford must have expected his orders would be executed.
 
 
 58
 Clayton, who was unaware of the April 16 disclosure announcement TGS was to make can, in support of his claim that the favorable news was public, rely only on the rumors and on the phone calls received by TGS prior to the placing of his order from those who seemed to have heard some version or rumors of the news. His awareness of the contents of the April 12 release renders unreasonable any claim that he believed the news was truly public.
 
 
 59
 Finally, Coates, as we have already indicated in fn. 19, supra, could not reasonably have expected the official release to have been disseminated when he placed his order before 10:20 for immediate execution nor were the Canadian disclosures relied on by Crawford sufficient to render the conduct of Coates permissible under the circumstances.[23]
 
 
 60
 E. May Insiders Accept Stock Options Without Disclosing Material Information To the Issuer?
 
 
 61
 On February 20, 1964, defendants Stephens, Fogarty, Mollison, Holyk and Kline accepted stock options issued to them and a number of other top officers of TGS, although not one of them had informed the Stock Option Committee of the Board of Directors or the Board of the results of K-55-1, which information we have held was then material. The SEC sought rescission of these options. The trial court, in addition to finding the knowledge of the results of the K-55 discovery to be immaterial, held that Kline had no detailed knowledge of the drilling progress and that Holyk and Mollison could reasonably assume that their superiors, Stephens and Fogarty, who were directors of the corporation, would report the results if that was advisable; indeed all employees had been instructed not to divulge this information pending completion of the land acquisition program, 258 F.Supp. at 291. Therefore, the court below concluded that only directors Stephens and Fogarty, of the top management, would have violated the Rule by accepting stock options without disclosure, but it also found that they had not acted improperly as the information in their possession was not material. 258 F.Supp. at 292. In view of our conclusion as to materiality we hold that Stephens and Fogarty violated the Rule by accepting them. However, as they have surrendered the options and the corporation has canceled them, supra at 292, n. 17, we find it unnecessary to order that the injunctions prayed for be actually issued. We point out, nevertheless, that the surrender of these options after the SEC commenced the case is not a satisfaction of the SEC claim, and a determination as to whether the issuance of injunctions against Stephens and Fogarty is advisable in order to prevent or deter future violations of regulatory provisions is remanded for the exercise of discretion by the trial court.
 
 
 62
 Contrary to the belief of the trial court that Kline had no duty to disclose his knowledge of the Kidd project before accepting the stock option offered him, we believe that he, a vice president, who had become the general counsel of TGS in January 1964, but who had been secretary of the corporation since January 1961, and was present in that capacity when the options were granted, and who was in charge of the mechanics of issuance and acceptance of the options, was a member of top management and under a duty before accepting his option to disclose any material information he may have possessed, and, as he did not disclose such information to the Option Committee we direct rescission of the option he received.[24] As to Holyk and Mollison, the SEC has not appealed the holding below that they, not being then members of top management (although Mollison was a vice president) had no duty to disclose their knowledge of the drilling before accepting their options. Therefore, the issue of whether, by accepting, they violated the Act, is not before us, and the holding below is undisturbed.
 
 II. THE CORPORATE DEFENDANT
 Introductory
 
 63
 At 3:00 P.M. on April 12, 1964, evidently believing it desirable to comment upon the rumors concerning the Timmins project, TGS issued the press release quoted in pertinent part in the text at page 845, supra. The SEC argued below and maintains on this appeal that this release painted a misleading and deceptive picture of the drilling progress at the time of its issuance, and hence violated Rule 10b-5(2).[25] TGS relies on the holding of the court below that 'the issuance of the release produced no unusual market action' and 'in the absence of a showing that the purpose of the April 12 press release was to affect the market price of TGS stock to the advantage of TGS or its insiders, the issuance of the press release did not constitute a violation of Section 10(b) or Rule 10b-5 since it was not issued 'in connection with the purchase or sale of any security" and, alternatively, 'even if it had been established that the April 12 release was issued in connection with the purchase or sale of any security, the Commission has failed to demonstrate that it was false, misleading or deceptive.' 258 F.Supp. at 294.
 
 
 64
 Before further discussing this matter it seems desirable to state exactly what the SEC claimed in its complaint and what it seeks. The specific SEC allegation in its complaint is that this April 12 press release '* * * was materially false and misleading and was known by certain of defendant Texas Gulf's officers and employees, including defendants Fogarty, Mollison, Holyk, Darke and Clayton, to be materially false and misleading.'
 
 
 65
 The specific relief the SEC seeks is, pursuant to Section 21(e) of Securities Exchange Act of 1934, 15 U.S.C. 78u(e), a permanent injunction restraining the issuance of any further materially false and misleading publicly distributed informative items.[26]
 
 
 66
 B. The 'In Connection With * * *' Requirement.
 
 
 67
 In adjudicating upon the relationship of this phrase to the case before us it would appear that the court below used a standard that does not reflect the congressional purpose that prompted the passage of the Securities Exchange Act of 1934.
 
 
 68
 The dominant congressional purposes underlying the Securities Exchange Act of 1934 were to promote free and open public securities markets and to protect the investing public from suffering inequities in trading, including, specifically, inequities that follow from trading that has been stimulated by the publication of false or misleading corporate information releases. Commenting on the disclosure purposes of the House bill (H.R. 9323), the bill a Committee of Conference eventually integrated with a similar Senate bill (S. 3420) to make the bill passed by both Houses of Congress that became the Securities Exchange Act of 1934, the House Committee which reported out H.R. 9323 stated:
 
 
 69
 The idea of a free and open public market is built upon the theory that competing judgments of buyers and sellers as to the fair price of a security brings about a situation where the market price reflects as nearly as possible a just price. Just as artificial manipulation tends to upset the true function of an open market, so the hiding and secreting of important information obstructs the operation of the markets as indices of real value. There cannot be honest markets without honest publicity. Manipulation and dishonest practices of the market place thrive upon mystery and secrecy. The disclosure of information materially important to investors may not instantaneously be reflected in market value, but despite the intricacies of security values truth does find relatively quick acceptance on the market. That is why in many cases it is so carefully guarded. Delayed, inaccurate, and misleading reports are the tools of the unconscionable market operator and the recreant corporate official who speculate on inside information. Despite the tug of conflicting interests and the influence of popular groups, responsible officials of the leading exchanges have unqualifiedly recognized in theory at least the vital importance of true and accurate corporate reporting as an essential cog in the proper functioning of the public exchanges. Their efforts to bring about more adequate and prompt publicity have been handicapped by the lack of legal power and by the failure of certain banking and business groups to appreciate that a business that gathers its capital from the investing public has not the same right to secrecy as a small privately owned and managed business. It is only a few decades since men believed that the disclosure of a balance sheet was a disclosure of a trade secret. Today few people would admit the right of any company to solicit public funds without the disclosure of a balance sheet. H.R.Rep.No. 1383, 73rd Cong., 2d Sess. 11 (1934).
 
 
 70
 Section 10(b) of the Act (see footnote 8, supra) was taken by the Conference Committee from Section 10(b) of the proposed Senate bill, S. 3420, and taken from it verbatim insofar as here pertinent. The only alteration made by the Conference Committee was to substitute the present closing language of Section 10(b), '* * * in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors' for the closing language of the original Section 10(b) of S. 3420, '* * * which the Commission may declare to be detrimental to the interests of investors.' 78 Cong.Rec. 10261 (1934).
 
 
 71
 The Report of the Senate Committee which presented S. 3420 to the Senate summarized Section 10(b) as follows:
 
 
 72
 Subsection (b) authorizes the Commission by rules and regulations to prohibit or regulate the use of any other manipulative or deceptive practices which it finds detrimental to the interests of the investor. S.Rep.No. 792, 73rd Cong., 2d Sess. 18 (1934).
 
 
 73
 Indeed, from its very inception, Section 10(b), and the proposed sections in H.R. 1383 and S. 3420 from which it was derived, have always been acknowledged as catchalls. See Bromberg, Securities Law: SEC Rule 10b-5, p. 19 (1967). In the House Committee hearings on the proposed House bill, Thomas G. Corcoran, Counsel with the Reconstruction Finance Corporation and a spokesman for the Roosevelt Administration, described the broad prohibitions contained in 9(c), the section which corresponded to Section 10(b) of S. 3420 and eventually to Section 10(b) of the Act, as follows: 'Subsection (c) says, 'Thou shalt not devise any other cunning devices' * * *. Of course subsection (c) is a catch-all clause to prevent manipulative devices. I do not think there is any objection to that kind of a clause. The Commission should have the authority to deal with new manipulative devices.' Stock Exchange Regulation, Hearings before the House Committee on Interstate and Foreign Commerce, 73rd Cong., 2d Sess. 115 (1934). Although several other witnesses objected to the breadth of the proposed prohibition that Corcoran was supporting, the section as enacted did not in any way limit the broad scope of the 'in connection with' phrase. See 3 Loss, Securities Regulation, 1424 n. 7 (2d ed. 1961).
 
 
 74
 Thus, the legislative history of Section 10(b) does not support the proposition urged upon us by Texas Gulf Sulphur that Congress intended the limited construction of the 'in connection with' phrase applied by the trial court. Moreover, comparisons of Section 10(b) with the antifraud provisions of the Securities Act of 1933 (12(2), 15 U.S.C. 77l(2) '* * * (offers or) sells a security by means of * * *'; 17(a), 15 U.S.C. 77q(a) '* * * in the (offer or) sale of any securities to obtain money or property by means of * * *'; (language in brackets was added in 1954 amendments)), and with the 1936 antifraud amendment of Section 15 of the Securities Exchange Act of 1934 (15(c) (1), 15 U.S.C. 78o(c)(1) '* * * effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security * * *') demonstrate that when Congress intended that there be a participation in a securities transaction as a prerequisite of a violation, it knew how to make that intention clear. See Bromberg, op. cit. supra Table 1 at 16-17.
 
 
 75
 Therefore it seems clear from the legislative purpose Congress expressed in the Act, and the legislative history of Section 10(b) that Congress when it used the phrase 'in connection with the purchase or sale of any security' intended only that the device employed, whatever it might be, be of a sort that would cause reasonable investors to rely thereon, and, in connection therewith, so relying, cause them to purchase or sell a corporation's securities. There is no indication that Congress intended that the corporations or persons responsible for the issuance of a misleading statement would not violate the section unless they engaged in related securities transactions or otherwise acted with wrongful motives; indeed, the obvious purposes of the Act to protect the investing public and to secure fair dealing in the securities markets would be seriously undermined by applying such a gloss onto the legislative language. Absent a securities transaction by an insider it is almost impossible to prove that a wrongful purpose motivated the issuance of the misleading statement. The mere fact that an insider did not engage in securities transactions does not negate the possibility of wrongful purpose; perhaps the market did not react to the misleading statement as much as was anticipated or perhaps the wrongful purpose was something other than the desire to buy at a low price or sell at a high price. Of even greater relevance to the Congressional purpose of investor protection is the fact that the investing public may be injured as much by one's misleading statement containing inaccuracies caused by negligence as by a misleading statement published intentionally to further a wrongful purpose. We do not believe that Congress intended that the proscriptions of the Act would not be violated unless the makers of a misleading statement also participated in pertinent securities transactions in connection therewith, or unless it could be shown that the issuance of the statement was motivated by a plan to benefit the corporation or themselves at the expense of a duped investing public.
 
 
 76
 Nor is there anything about Rule 10b-5 which demonstrates that the SEC sought by the Rule not fully to implement the Congressional purpose and objectives underlying Section 10(b). See Securities Exchange Act of 1934, Release No. 3230 (May 21, 1942); 10 SEC Ann.Rep. 56-7 (1944); 8 SEC Ann.Rep. 10 (1942). To be sure, SEC official publicity accompanying the promulgation of the Rule emphasized the insider trading aspects of the Rule, particularly the prohibition against purchases by insiders, but this was emphasized because 'the previously existing rules against fraud in the purchase of securities applied only to brokers and dealers,' 8 SEC Ann.Rep. 10, and the Commission wished to make it emphatically clear that the Rule was expected, inter alia, to close this loophole.
 
 
 77
 The foregoing discussion demonstrates that Congress intended to protect the investing public in connection with their purchases or sales on Exchanges from being misled by misleading statements promulgated for or on behalf of corporations irrespective of whether the insiders contemporaneously trade in the securities of that corporation and irrespective of whether the corporation or its management have an ulterior purpose or purposes in making an official public release. Indeed, the Commission has been charged by Congress with the responsibility of policing all misleading corporate statements from those contained in an initial prospectus to those contained in a notice to stockholders relative to the need or desirability of terminating the existence of a corporation or of merging it with another. To render the Congressional purpose ineffective by inserting into the statutory words the need of proving, not only that the public may have been misled by the release, but also that those responsible were actuated by a wrongful purpose when they issued the release, is to handicap unreasonably the Commission in its work. We should have in mind the wise words of Judge Learned Hand in Cawley v. United States, 272 F.2d 443, 445 (2 Cir. 1959), relative to an interpretation of the words contained within a congressional statute, that '* * * unless they explicitly forbid it, the purpose of a statutory provision is the best test of the meaning of the words chosen. We are to put ourselves so far as we can in the position of the legislature that uttered them, and decide whether or not it would declare that the situation that has arisen is within what it wishes to cover. Indeed, at times the purpose may be so manifest as to override even the explicit words used. Markham v. Cabell,326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165.'
 
 
 78
 As was pointed out by the trial court, 258 F.Supp. at 293, the intent of the Securities Exchange Act of 1934 is the protection of investors against fraud. Therefore, it would seem elementary that the Commission has a duty to police management so as to prevent corporate practices which are reasonably likely fraudulently to injure investors. And, of course, as we have already emphasized, a corporation's misleading material statement may injure an investor irrespective of whether the corporation itself, or those individuals managing it, are contemporaneously buying or selling the stock of the corporation. Therefore, when materially misleading corporate statements or deceptive insider activities have been uncovered, the courts, as they should, have broadly construed the statutory phrase 'in connection with the purchase or sale of any security.' Freed v. Szabo Food Serv., Inc., CCH Fed. SEC L.Rep. P91,317 (N.D.Ill.1964); Stockwell v. Reynolds & Co., 252 F.Supp. 215 (SDNY 1965); Cooper v. North Jersey Trust Co., 226 F.Supp. 972, 978 (SDNY 1964); Miller v. Bargain City, U.S.A., Inc., 229 F.Supp. 33, 37 (E.D.Pa.1964); see Ruder, Corporate Disclosures Required by the Federal Securities Laws: The Codification Implications of Texas Gulf Sulphur, 61 Nw.U.L.Rev. 872, 895 (1967). The court below found: 'There is no evidence that TGS derived any direct benefit from the issuance of the press release or that any of the defendants who participated in its preparation used it to their personal advantage.' 258 F.Supp. at 294. The requirement that a statement may not be found misleading unless its issuance is actuated by a 'wrongful purpose' might well have the effect of permitting the issuers of misleading statements to seek an advantage but to escape liability if the advantage fails to materialize to the degree contemplated, or cannot be demonstrated.
 
 
 79
 More important, however, is the realization which we must again underscore at the risk of repetition, that the investing public is hurt by exposure to false or deceptive statements irrespective of the purpose underlying their issuance.[27] It does not appear to be unfair to impose upon corporate management a duty to ascertain the truth of any statements the corporation releases to its shareholders or to the investing public at large. Accordingly, we hold that Rule 10b-5 is violated whenever assertions are made, as here, in a manner reasonably calculated to influence the investing public, e.g., by means of the financial media, Fleischer, supra,51 Va.L.Rev. at 1294-95, if such assertions are false or misleading or are so incomplete as to mislead irrespective of whether the issuance of the release was motivated by corporate officials for ulterior purposes. It seems clear, however, that if corporate management demonstrates that it was diligent in ascertaining that the information it published was the whole truth and that such diligently obtained information was disseminated in good faith, Rule 10b-5 would not have been violated.
 
 
 80
 C. Did the Issuance of the April 12 Release Violate Rule 10b-5?
 
 
 81
 Turning first to the question of whether the release was misleading, i.e., whether it conveyed to the public a false impression of the drilling situation at the time of its issuance, we note initially that the trial court did not actually decide this question. Its conclusion that 'the Commission has failed to demonstrate that it was false, misleading or deceptive,' 258 F.Supp. at 294, seems to have derived from its views that 'The defendants are to be judged on the facts known to them when the April 12 release was issued,'258 F.Supp. at 295, that the draftsmen 'exercised reasonable business judgment under the circumstances,' 258 F.Supp. at 296, and that the release was not 'misleading or deceptive on the basis of the facts then known,' 258 F.Supp. at 296 rather than from an appropriate primary inquiry into the meaning of the statement to the reasonable investor and its relationship to truth. While we certainly agree with the trial court that 'in retrospect, the press release may appear gloomy or incomplete,'[28] 258 F.Supp. at 296, we cannot, from the present record, by applying the standard Congress intended, definitively conclude that it was deceptive or misleading to the reasonable investor, or that he would have been misled by it. Certain newspaper accounts of the release viewed the release as confirming the existence of preliminary favorable developments, and this optimistic view was held by some brokers, so it could be that the reasonable inverstor would have read between the lines of what appears to us to be an inconclusive and negative statement and would have envisioned the actual situation at the Kidd segment on April 12. On the other hand, in view of the decline of the market price of TGS stock from a high of 32 on the morning of April 13 when the release was disseminated to 29 3/8 by the close of trading on April 15, and the reaction to the release by other brokers, it is far from certain that the release was generally interpreted as a highly encouraging report or even encouraging at all. Accordingly, we remand this issue to the district court that took testimony and heard and saw the witnesses for a determination of the character of the release in the light of the facts existing at the time of the release, by applying the standard of whether the reasonable investor, in the exercise of due care, would have been misled by it.
 
 
 82
 In the event that it is found that the statement was misleading to the reasonable investor it will then become necessary to determine whether its issuance resulted from a lack of due diligence. The only remedly the Commission seeks against the corporation is an injunction, see footnote 26, supra, and therefore we do not find it necessary to decide whether just a lack of due diligence on the part of TGS, absent a showing of bad faith, would subject the Corporation to any liability for damages. We have recently stated in a case involving a private suit under Rule 10b-5 in which damages and an injunction were sought, "It is not necessary in a suit for equitable or prophylactic relief to establish all the elements required in a suit for monetary damages." Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540, 547, quoting from SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 193, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963)
 
 
 83
 We hold only that, in an action for injunctive relief, the district court has the discretionary power under Rule 10b-5 and Section 10(b) to issue an injunction, if the misleading statement resulted from a lack of due diligence on the part of TGS. The trial court did not find it necessary to decide whether TGS exercised such diligence and has not yet attempted to resolve this issue. While the trial court concluded that TGS had exercised 'reasonable business judgment under the circumstances,' 258 F.Supp. at 296 it applied an incorrect legal standard in appraising whether TGS should have issued its April 12 release on the basis of the facts known to its draftsmen at the time of its preparation, 258 F.Supp. at 295, and in assuming that disclosure of the full underlying facts of the Timmins situation was not a viable alternative to the vague generalities which were asserted. 258 F.Supp. at 296.
 
 
 84
 It is not altogether certain from the present record that the draftsmen could, as the SEC suggests, have readily obtained current reports of the drilling progress over the weekend of April 10-12, but they certainly should have obtained them if at all possible for them to do so. However, even if it were not possible to evaluate and transmit current data in time to prepare the release on April 12, it would seem that TGS could have delayed the preparation a bit until an accurate report of a rapidly changing situation was possible. See 258 F.Supp. at 296. At the very least, if TGS felt compelled to respond to the spreading rumors of a spectacular discovery, it would have been more accurate to have stated that the situation was in flux and that the release was prepared as of April 10 information rather than purporting to report the progress 'to date.' Moreover, it would have obviously been better to have specifically described the known drilling progress as of April 10 by stating the basic facts. Such an explicit disclosure would have permitted the investing public to evaluate the 'prospect' of a mine at Timmins without having to read between the lines to understand that preliminary indications were favorable-- in itself an understatement.
 
 
 85
 The choice of an ambiguous general statement rather than a summary of the specific facts cannot reasonably be justified by any claimed urgency. The avoidance of liability for misrepresentation in the event that the Timmins project failed, a highly unlikely event as of April 12 or April 13, did not forbid the accurate and truthful divulgence of detailed results which need not, of course, have been accompanied by conclusory assertions of success. Nor is it any justification that such an explicit disclosure of the truth might have 'encouraged the rumor mill which they were seeking to allay.' 258 F.Supp. at 296.
 
 
 86
 We conclude, then, that, having established that the release was issued in a manner reasonably calculated to affect the market price of TGS stock and to influence the investing public, we must remand to the district court to decide whether the release was misleading to the reasonable investor and if found to be misleading, whether the court in its discretion should issue the injunction the SEC seeks.
 
 CONCLUSION
 
 87
 In summary, therefore, we affirm the finding of the court below that appellants Richard H. Clayton and David M. Crawford have violated 15 U.S.C. 78j(b) and Rule 10b-5; we reverse the judgment order entered below dismissing the complaint against appellees Charles F. Fogarty, Richard H. Clayton, Richard D. Mollison, Walter Holyk, Kenneth H. Darke, Earl L. Huntington, and Francis G. Coates, as we find that they have violated 15 U.S.C. 78j(b) and Rule 10b-5. As to these eight individuals we remand so that in accordance with the agreement between the parties the Commission may notice a hearing before the court below to determine the remedies to be applied against them. We reverse the judgment order dismissing the complaint against Claude O. Stephens, Charles F. Fogarty, and Harold B. Kline as recipients of stock options, direct the district court to consider in its discretion whether to issue injunction orders against Stephens and Fogarty, and direct that an order issue rescinding the option granted Kline and that such further remedy be applied against him as may be proper by way of an order of restitution; and we reverse the judgment dismissing the complaint against Texas Gulf Sulphur Company, remand the cause as to it for a further determination below, in the light of the approach explicated by us in the foregoing opinion, as to whether, in the exercise of its discretion, the injunction against it which the Commission seeks should be ordered.
 
 
 88
 Purchase Shares Calls
 Date Purchaser Number Price Number Price
Hole K-55-1 Completed November 12, 1963
 1963
Nov. 12 Fogarty 300 17 3/4-18
 15 Clayton 200 17 3/4
 15 Fogarty 700 17 5/8-17 7/8
 15 Mollison 100 17 7/8
 19 Fogarty 500 18 1/8
 26 Fogarty 200 17 3/4
 29 Holyk (Mrs.) 50 18
Chemical Assays of Drill Core of K-55-1 Received December 9-13, 1963
Dec. 10 Holyk (Mrs.) 100 20 3/8
 12 Holyk (or wife) 200 21
 13 Mollison 100 21 1/8
 30 Fogarty 200 22
 31 Fogarty 100 23 1/4
 1964
Jan. 6 Holyk (or wife) 100 23 5/8
 8 Murray 400 23 1/4
 24 Holyk (or wife) 200 22 1/4-
 -22
 3/8
FEB. 10 Fogarty 300 22 1/8-22 1/4
 20 Darke 300 24 1/8
 24 Clayton 400 23 7/8
 24 Holyk (or wife) 200 24 1/8
 26 Holyk (or wife) 200 23 3/8
 26 Huntington 50 23 1/4
 27 Darke (Moran as nominee) 1000 22 5/8-
 -22
 3/4
Mar. 2 Holyk (Mrs.) 200 22 3/8
 3 Clayton 100 22 1/4
 16 Huntington 100 22 3/8
 16 Holyk (or wife) 300 23 1/4
 17 Holyk (Mrs.) 100 23 7/8
 23 Darke 1000 24 3/4
 26 Clayton 200 25
Land Acquisition Completed March 27, 1964
Mar. 30 Darke 1000 25 1/2
 30 Holyk (Mrs.) 100 25 7/8
Core Drilling of Kidd Segment Resumed March 31, 1964
April 1 Clayton 60 26 1/2
 1 Fogarty 400 26 1/2
 2 Clayton 100 26 7/8
 6 Fogarty 400 28 1/8-28 7/8
 8 Mollison (Mrs.) 100 28 1/8
First Press Release Issued April 12, 1964
April 15 Clayton 200 29 3/8
 16 Crawford (and wife) 600 30 1/8-30 1/4
Second Press Release Issued 10:00-10:10 or 10:15 A.M.,April 16, 1964
 Purchase Shares Calls
 Date Purchaser Number Price Number Price
 1963
April 16 (app. 10:20 A.M.)
 Coates (for family trusts) 2000 31 -31 5/8
Purchase Shares Calls
 Date Purchaser Number Price Number Price
Chemicals Assays of K-55-1 Received Dec.9-13, 1963
 1963
Dec. 30 Caskey (Darke) 300 22 1/4
 1964
Jan. 16 Westreich (Darke) 2000 21 1/4-21
 3/4
Feb. 17 Atkinson (Darke) 50 23 1/4 200 23 1/8
 17 Westreich (Darke) 50 23 1/4 1000 23 1/4-23 3/8
 24 Miller (Darke) 200 23 3/4
 25 Miller (Darke) 300 23 3/8-23 1/2
Mar. 3 E. W. Darke (Darke) 500 22 1/2-22 5/8
 17 E. W. Darke (Darke) 200 23 3/8
Land Acquisition Completed Mar. 27, 1964
 1964
Mar. 30 Atkinson (Darke) 400 25 3/4-25 7/8
 Caskey (Darke) 100 25 7/8
 E. W. Darke (Darke) 1000 25 3/4-25 7/8
 Miller (Darke) 200 25 1/2
 Westreich (Darke) 500 25 3/4
 30-31 Klotz (Darke) 2000 25 1/2-26 1/8
Second Press Release Issued April 16, 1964 (Reported over Dow Jones tape at
10:54 A.M.)
April 16 (from 10:31 A.M.)
 Haemisegger (Coates) 1500 31 1/4-35
 
 FRIENDLY, Circuit Judge (concurring):
 
 89
 Agreeing with the result reached by the majority and with most of Judge Waterman's searching opinion, I take a rather different approach to two facets of the case.
 
 I.
 
 90
 The first is a situation that will not often arise, involving as it does the acceptance of stock options during a period when inside information likely to produce a rapid and substantial increase in the price of the stock was known to some of the grantees but unknown to those in charge of the granting. I suppose it would be clear, under Ruckle v. Roto American Corp., 339 F.2d 24 (2 Cir. 1964),[1] that if a corporate officer having such knowledge persuaded an unknowing board of directors to grant him an option at a price approximation the current market, the option would be rescindable in an action under Rule 10b-5. It would seem, by the same token, that if, to make the pill easier to swallow, he urged the directors to include others lacking the knowledge he possessed, he would be liable for all the resulting damage. The novel problem in the instant case is to define the responsibility of officers when a directors' committee administering a stock option plan proposes of its own initiative to make options available to them and others at a time when they know that the option price, geared to the market value of the stock, did not reflect a substantial increment likely to be realized in short order and was therefore unfair to the corporation.
 
 
 91
 A rule requiring a minor officer to reject an option so tendered would not comport with the realities either of human nature or of corporate life. If the SEC had appealed the ruling dismissing this portion of the complaint as to Holyk and Mollison, I would have upheld the dismissal quite apart from the special circumstance that a refusal on their part could well have broken the wall of secrecy it was important for TGS to preserve. Whatever they knew or didn't know about Timmins, they were entitled to believe their superiors had reported the facts to the Option Committee unless they had information to the contrary. Stephens, Fogarty and Kline stand on an altogether different basis; as senior officers they had an obligation to inform the Committee that this was not the right time to grant options at 95% Of the current price. Silence, when there is a duty to speak, can itself be a fraud. I am unimpressed with the argument that Stephens, Fogarty and Kline could not perform this duty on the peculiar facts of this case, because of the corporate need for secrecy during the land acquisition program. Non-management directors would not normally challenge a recommendation for postponement of an option plan from the President, the Executive Vice President, and the Vice President and General Counsel. Moreover, it should be possible for officers to communicate with directors, of all people, without fearing a breach of confidence. Hence, as one of the foregoing hypotheticals suggests, I am not at all sure that a company in the position of TGS might not have a claim against top officers who breached their duty of disclosure for the entire damage suffered as a result of the untimely issuance of options, rather than merely one for rescission of the options issued to them.[2] Since that issue is not before us, I merely make the reservation of my position clear.
 
 II.
 
 92
 The second point, to me transcending in public importance all others in this important case, is the press release issued by TGS on April 12, 1964. This seems to me easier on the facts but harder on the law than it does to the majority.
 
 
 93
 No one has asserted, or reasonably could assert, that the purpose for issuing a release was anything but good. TGS felt it had a responsibility to protect would-by buyers of its shares from what it regarded as exaggerated rumors first in the Canadian and then in the New York City press, and none of the individual defendants sought to profit from the decline in the price of TGS stock caused by the release. I find it equally plain, as Judge Waterman's opinion convincingly demonstrates, that the release did not properly convey the information in the hands of the draftsmen on April 12, even granting, as I would, that in a case like this a court should not set the standard of care too high. To say that the drilling at Timmins had afforded only 'preliminary indications that more drilling would be required for proper evaluation of this prospect,' was a wholly insufficient statement of what TGS knew. Cf. Gediman v. Anheuser Busch, Inc., 299 F.2d 537, 545 (2 Cir. 1962). Since the issue of negligence is open to full review, Mamiye Bros v. Barber SS. Lines, 360 F.2d 774 (2 Cir.), cert. denied, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed. 2d 80 (1965); Esso Standard Oil, S.A. v. S.S. Gasbras Sul, 387 F.2d 573 (2 Cir.), cert. denied, 391 U.S. 914, 88 S.Ct. 1808, 20 L.Ed.2d 653 (May 21, 1968), I see no need for a remand on that score. It is an equally needless exercise cise to require the district court to determine whether a reasonable investor would have been misled. The text of the release and the three point drop in the market price following its issuance in the face of press reports that would normally have led to a large and, as matters developed, justified increase, are sufficient proof of that.
 
 
 94
 The majority says that negligent misstatement by a corporation is enough for injunctive relief under Rule 10b-5(2) in a proper case; it reserves the question, not here presented, whether the corporation is liable for damages. I think the remand should make crystal clear that the issue whether this is a proper case for an injunction remains open, and that with 49 private actions pending in the District Court for the Southern District of New York, see 258 F.Supp. 262, 267 n. 1 (1966), some of which may involve this issue, we should explicate more clearly why, despite the principle that a violation of the securities laws or regulations generally gives rise to a private claim for damages, see J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), violation of Rule 10b-5(2) may not do so under all circumstances, including those presented by the April 12 press release. The attention this case has received from the profession and our in banc consideration make it incumbent on us to give the district courts in our circuit as much guidance as we can.
 
 A.
 
 95
 The consequences of holding that negligence in the drafting of a press release such as that of April 12, 1964, may impose civil liability on the corporation are frightening. As has been well said, of a situation where time pressures and consequent risks were less, 'One source of perplexity as to the appropriate bounds of the civil remedy for misleading filings is that any remedy imposed against the issuer itself is indirectly imposed on all holders of the common stock, usually the most important segment of the total category of investors intended to be protected.' Milton Cohen, Truth in Securities Revisited, 79 Harv.L.Rev. L.Rev. 1340, 1370 (1967). Beyond this, a rule imposing civil liability in such cases would work directly counter to what the SEC has properly called 'a commendable and growing recognition on the part of industry and the investment community of the importance of informing security holders and the public generally with respect to important business and financial developments.' Securities Act Interpretation Release No. 3844 (Oct. 8, 1957). If the only choices open to a corporation are either to remain silent and let false rumors do their work, or to make a communication, not legally required, at the risk that a slip of the pen or failure properly to amass or weigh the facts-- all judged in the bright gleam of hindsight-- will lead to large judgments, payable in the last analysis by innocent investors, for the benefit of speculators and their lawyers, most corporations would opt for the former.
 
 
 96
 The derivation of Rule 10b-5 is peculiar. Although the authority for the Rule comes from 10(b) of the Securities and Exchange Act of 1934, the draftsmen turned their backs on the language of that section and borrowed the words of 17 of the Securities Act of 1933, simply broadening these to include frauds on the seller as well as on the buyer. So far as concerns paragraphs (1) and (3), this is not very important since these are clearly within the ambit of 10(b) and relate to frauds that would give rise to civil liability in any event. But the case stands differently as to paragraph (2). The only provision in either the 1933 or the 1934 Act that can be read to impose liability for damages for negligent misrepresentation without restrictions as to the kinds of plaintiffs, due diligence defenses, a short statute of limitations, or an undertaking for costs that were insisted on by the investment community, is 17(a)(2) of the Act of 1933-- the source of Rule 10b-5(2).[3] But there is unanimity among the commentators, including some who were in a peculiarly good position to know, that 17(a)(2) of the 1933 Act-- indeed the whole of 17-- was intended only to afford a basis for injunctive relief and, on a proper showing, for criminal liability, and was never believed to supplement the actions for damages provided by 11 and 12. See Landis, Liability Sections of Securities Act, 18 Am.Acct. 330, 331 (1933); Douglas and Bates, Federal Securities Act of 1933, 43 Yale L.J. 171, 181-82 (1933); 3 Loss, Securities Regulation 1785-86 (1961). When the House Committee Report listed the sections that 'define the civil liabilities imposed by the Act' it pointed only to 11 and 12 and stated that 'to impose a greater responsibility (than that provided by 11 and 12) * * * would unnecessarily restrain the conscientious administration of honest business with no compensating advantage to the public.' H.Rep.No. 85, 73dCong., 1st Sess. 9-10 (1933). Once it had been established, however, that an aggrieved buyer has a private action under 10(b) of the 1934 Act, there seemed little practical point in denying the existence of such an action under 17-- with the important proviso that fraud, as distinct from mere negligence, must be alleged. See Fischman v. Raytheon Mfg. Corp., 188 F.2d 783, 787 n. 2 (2 Cir. 1951); Weber v. C.M.P. Corp., 242 F.Supp. 321, 322-325 (S.D.N.Y.1965) (Wyatt, J.); Thiele v. Shields, 131 F.Supp. 416, 419 (S.D.N.Y.1955) (Kaufman, J.); but see Dack v. Shanman, 227 F.Supp. 26 (S.D.N.Y.1964). To go further than this, as Professor Loss powerfully argues, Securities Regulation at 1785, would totally undermine the carefully framed limitations imposed on the buyer's right to recover granted by 12(2) of the 1933 Act.
 
 
 97
 Even if, however, we were to disregard the teaching of Judge Frank in Fischman v. Raytheon Mfg. Corp., supra, 188 F.2d at 786, and follow the lead of those Circuits that seem to have discarded the scienter requirement in actions for damages under Rule 10b-5,[4] Ellis v. Carter, 291 F.2d 270, 274 (9 Cir. 1961); Royal Air Properties, Inc. v. Smith, 312 F.2d 210, 212 (9 Cir. 1962); Kohler v. Kohler Co., 208 F.Supp. 808, 823 (E.D.Wisc.1962) (dictum), aff'd, 319 F.2d 634 (7 Cir. 1962); Stevens v. Vowell, 343 F.2d 374 (10 Cir. 1965); Myzel v. Fields, 386 F.2d 718 (8 Cir. 1967); we should not impose such expansive liability in a situation, markedly different from those considered in the cases just cited, where to do so would frustrate, not further, the larger goals of the securities laws. While I am not convinced that imposition of liability for damages under Rule 10b-5(2), absent a scienter requirement, even limited in the way just proposed, would not go beyond the authority vested in the Commission by 10(b) to act against 'any manipulative or deceptive device or contrivance' and be so inconsistent with the general structure of the statutes as to be impermissible, it is at least clear that the April 12 press release would be the worst possible case for the award of damages for merely negligent misstatement, as distinguished from the kind of recklessness that is equivalent to wilful fraud, see SEC v. Frank, 388 F.2d 486, 489 (2 Cir. 1968).
 
 
 98
 The issue here, however, is the different one of an injunction. Mr. Justice Goldberg noted in SEC v. Capital Gains Research Bureau, 375 U.S. 180, 193, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963), that the elements of a cause of action for 'fraud' vary 'with the nature of the relief sought' and that 'It is not necessary in a suit for equitable or prophylactic relief to establish all the elements required in a suit for money damages.' See also Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540, 547 (2 Cir. 1968). It can, indeed, be argued that, even on this basis, Rule 10b-5(2), absent the reading in of a scienter requirement, goes beyond the authority granted by 10(b) of the 1934 Act. However, it cannot be doubted that one of the most important purposes of the securities legislation was to prevent improper information being circulated by the issuer, and I therefore am not disposed to hold that Congress meant to deny a power whose use in appropriate cases can be of such great public benefit and do so little harm to legitimate activity.
 
 B.
 
 99
 However, it does not necessarily follow that this is an appropriate case for granting an injunction as to future press releases. While we have often said that 'a cessation of the alleged objectionable activities by the defendant in contemplation of an SEC suit will not defeat the district court's power to grant an injunction restraining continued activity,' SEC v. Boren, 283 F.2d 312 (2 Cir. 1960), and cases there cited, it is likewise true that an isolated violation, especially in the absence of bad faith, does not require such relief. SEC v. Torr, 87 F.2d 446 (2 Cir. 1937). Absent much clearer language than is found in the 1934 Act, the entitlement of a plaintiff to an injunction thereunder remains subject to principles of equitable discretion. The Supreme Court made this clear beyond peradventure in the leading case of Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944). See 3 Loss, Securities Regulation 1975-83 (1961). Here there is no danger of repetition of an unduly gloomy press release like that of April 12. The essence of the SEC's case is that Timmins was a once-in-a-lifetime affair; the company's motive in issuing the release was laudable; and the defect was solely a pardonable one of execution. If Judge Bonsal had denied a injunction on these grounds, I see no basis on which we could properly have reversed him. Instead he acted on the view, erroneous in the court's belief, that no violation of the Rule had occurred and he was thus without power to enjoin, 258 F.Supp. 296. Although I see no reason why we could not affirm nevertheless, I am content to leave it for him to consider whether, although he has power to issue an injunction, there is equity in this portion of the bill. My concurrence in the disposition of the press release issue assumes that such consideration is permitted.
 
 IRVING R. KAUFMAN, Circuit Judge (concurring):
 
 100
 I concur in Judge Waterman's reasoned and thorough opinion and in the court's disposition of the instant appeal. I agree with Judge Friendly, however, that we should provide guidance to the District Courts with respect to pending private claims for damages based upon Rule 10(b)(5) arising out of the transactions now before us. And, I concur in as much as Part II of Judge Friendly's opinion as discusses the origins of the rule and the relevance of today's decision-- involving only an application by the S.E.C. for an injunction-- to private damage actions.
 
 ANDERSON, Circuit Judge (concurring):
 
 101
 I concur in Judge Waterman's majority opinion and I concur in the discussion of law set forth in Part II of Judge Friendly's concurring opinion.
 
 
 102
 HAYS, Circuit Judge (concurring in part and dissenting in part):
 
 
 103
 I concur generally with Judge Waterman in his views as to the proper interpretation of Section 10(b) and Rule 10b-5 and as to the standards which are to be employed in the application of the statute and the rule.
 
 
 104
 With the exception of Stephens and Fogarty as recipients of stock options, I agree with the majority on the disposition of the cases involving individuals.
 
 
 105
 I do not agree on the remand of the issue with respect to Stephens and Fogarty as recipients of stock options. It seems to me clear that the injunction sought by the Commission should be granted.
 
 
 106
 The majority remand the case against the corporate defendant to the district court for a determination as to whether the April 12 press release was misleading and whether, if so, those responsible for the release used due diligence.
 
 
 107
 In my opinion the evidence establishes as a matter of law that the press release was misleading. Indeed, if the correct standard is applied, the finding of the trial court requires the conclusion that the press release was misleading:
 
 
 108
 'At 7:00 p.m. on April 9, those with knowledge of the drilling results had material information which it was reasonably certain, if disclosed, would have had a substantial impact on the market price of TGS stock.'
 
 
 109
 The evidence in the record in support of this finding is overwhelming.
 
 
 110
 Assuming arguendo that the corporation cannot be enjoined except on a showing of lack of due diligence, since Fogarty and those who assisted him in the preparation of the press release were aware of the drilling results to which the district court's finding refers, they obviously did not use due diligence in the preparation of the misleading press release.
 
 
 111
 I would grant the application for an injunction.
 
 
 112
 MOORE, Circuit Judge (dissenting) (with whom Chief Judge LUMBARD concurs):
 
 
 113
 In their opinion, the majority have become so involved in usurping the function of the trial court, in selecting the witnesses they (at variance with the trial court) choose to believe, in forming their own factual conclusions from the evidence (in disregard of Rule 52 (a)), in deciding with, of course, the benefit of the wisdom of hindsight, how they, had they been executives of Texas Gulf Sulphur Company (TGS), would have handled the publicity attendant to the exploration of the Timmins property, in determining (to their own satisfaction) the motives which prompted each of the individual defendants to buy TGS stock and in becoming mining engineering experts in their own right, that I find it desirable-- in fact, essential -- to state my opinion as to the fundamental jurisdiction of the Court of Appeals and the issues properly before us. Primarily, our task should be to review errors of law. Conversely, we are not a jury of nine with no requirement of a unanimous verdict.
 
 
 114
 If the facts are to be reappraised by an appellate court, they should be measured mutatis mutandis in accordance with the standard set for himself by an experienced and learned trial judge who stated his approach in a case charging directors with wrongdoing, as follows:
 
 
 115
 'The Court has endeavored * * * to judge the transactions in issue in this case by the applicable legal standards but without the benefit of hindsight as to the facts.' (Herlands, D.J., in Marco, etc. v. Bank of New York, 272 F.Supp. 636, 639 (S.D.N.Y., 1967).)
 
 
 116
 More, specifically, the Court in Marco said:
 
 
 117
 'The Court is asked by plaintiff, in effect, to substitute its judgment for that of the directors with respect to transactions affecting the internal affairs of the corporation in question. * * * As directors they were, of course, required to perform their duties in accordance with the high standards of fidelity, honesty and prudence applicable to fiduciaries.' (p. 639)
 
 
 118
 The Securities and Exchange Commission (referred to as the 'SEC' and 'Commission'), as an agency of government, has the responsibility of prosecuting persons who, and corporations which, in its judgment have violated laws which the Congress has enacted for the praiseworthy purpose of protecting the public from securities frauds. However, as such an enforcement agency, where it assumes a plaintiff's role it must bear the evidentiary fair preponderance burden of all litigants and be subject to the rule that the determination of what evidence is 'credible' is for the trial judge.
 
 The Issues
 
 119
 The case logically and chronologically can be divided into two parts: (1) the purchase of TGS stock by individual defendants and stock options issued to them between November 12, 1963 and April 9, 1964, and (2) the TGS press release of April 12, 1964. The stock purchases by Clayton, Crawford and Coates on April 16, 1964, are considered later.
 
 
 120
 (1) In resolving the stock purchase issue, the primary factual inquiry must be concentrated on (a) the nature and extent of the knowledge possessed by, or available to, the purchaser on the date of purchase, and (b) the position of the purchaser in relation to TGS. The primary legal issue in substance is what duty, if any, rested upon the purchasers to disclose the knowledge they possessed at the time of purchase. The Commission argues that there was a failure to disclose material information. The trial court based its opinion largely upon the lack of materiality of such exploration results as were known between November 12, 1963 and April 9, 1964.
 
 
 121
 (2) Was the TGS press release of April 12, 1964, false, misleading or deceptive within the meaning of Section 10(b) and Rule 10b-5 in the light of TGS' then knowledge and the then existing factual situation.
 
 The Facts
 
 122
 By-passing momentarily the general knowledge possessed by the officers of TGS as to the far-flung nature of the company's operations, its heavy concentration in the sulphur field, its nonengagement in the field of copper mining, the adverse effect which low sulphur prices had had for many years on the company's earnings despite substantial sales and focusing attention solely upon the Timmins property, the participants in that exploration and the knowledge available to them, I find no factual disputes of importance.
 
 
 123
 On November 8, 1963, TGS, selecting the most promising area of the onequarter section then controlled by it, referred to as Kidd 55, drilled an exploratory hole, 1 1/8 inches in diameter. All the information that was available upon the completion of the drilling, November 12, 1963, was contained in a core (denominated K-55-1) which was visually examined by Dr. Walter Holyk, Chief Geologist for TGS, and by Kenneth H. Darke, a TGS geologist. This core was unusually good in mineral content. The President, Claude O. Stephens, the Executive Vice-President, Charles F. Fogarty, and the Exploration Vice President, Richard D. Mollison, were notified, and Fogarty and Mollison flew to the drill site.
 
 
 124
 In order to acquire the other three-quarters of the K-55 segment, further drilling was discontinued except for one hole drilled to produce a barren core and the site was camouflaged. Thus, but for a chemicial assay made in December 1963 of contents of this same core, no other knowledge of the nature and possible extent of the area was available during the acquisition program.
 
 
 125
 Rule 52(a) should be given particular weight where expert testimony must of necessity play an important role. Here the trial court had an opportunity not only to hear the qualifications of the experts but also from their demeanor and responses to form its opinion as to their credibility. The importance of this opportunity to observe where technical or scientific problems are before the court, as here, has been succinctly stated by the Supreme Court in Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950):
 
 
 126
 'Like any other issue of fact, final determination requires a balancing of credibility, persuasiveness and weight of evidence. It is to be decided by the trial court and that court's decision, under general principles of appellate review, should not be disturbed unless clearly erroneous. Particularly is this so in a field where so much depends upon familiarity with specific scientific problems and principles not usually contained in the general storehouse of knowledge and experience.' (pp. 609-610, 70 S.Ct. p 857)
 
 
 127
 'It is not for this Court (the Supreme Court) to even essay an independent evaluation of this evidence. This is the function of the trial court. And, as we have heretofore observed, 'To no type of case is this * * * more appropriately applicable than to the one before us, where the evidence is largely the testimony of experts as to which a trial court may be enlightened by scientific demonstrations. * * *' 336 U.S. 271, 274-5.' (p. 611, 70 S.Ct. p. 857)
 
 
 128
 No more is it for this court to make an independent essay of the evidence or of the core. Wanting the knowledge requisite to making our own appraisal of the significance of the core, we must depend upon the experts. A correct decision in this case may well hang upon their testimony and its credibility because what these observers knew or should have known between November 12, 1963 and April 9, 1964 is basic to a determination of what, if anything, should have been disclosed or whether it was 'material.'
 
 
 129
 For the defendants, Dean Forrester, Dean of the College of Mines of the University of Arizona and Director of the Arizona Bureau of Mines, said that 'one hole is evidence of what you encounter only in that hole' and that even after K-55-3 was drilled in April 1964, it was 'much more likely that the materials exposed in those two holes will extend for, let's say two feet outside the limits of the hole than it is likely that it will extend 25 feet or that it will extend 50 feet.'
 
 
 130
 Dr. Park, former Dean of the School of Earth Sciences at Stanford, admitted that K-55-1 was 'an interesting one, a good one' but that there was not 'any evidence at all for any discussion of extent, from one drill hole.' Dr. Lacy, head of the mining department of the University of Arizona, was of the opinion that 'There is no basis for making any sort of prediction out from the hole.'
 
 
 131
 Wiles, a consulting mining engineer, conceded that K-55-1 was a remarkable drill hole but that he could not estimate therefrom the probabilities of finding a commercially mineable body of ore, adding that he had had 'the misfortune of having found a very attractive first hole and after drilling 52 around it got no more ore.' Walkey, the manager of the Kamkotia, a mine some 12 miles distant from the Timmins property, testified that the geological composition of the Kamkotia and TGS areas was similar but that he could neither estimate nor say the chances were good of proving a substantial body of ore as a result of K-55-1.
 
 
 132
 Even the Commission's experts, Adelstein and Pennebaker, would not estimate what ore, if any, might lie beyond the 1 1/8 inch core.
 
 Adelstein:
 
 133
 'I think assay value given for a drill hole, standing by itself without surrounding information, cannot be interpreted by itself as to what it really means.'
 
 Pennebaker:
 
 134
 Q. You certainly couldn't compute any tonnage from that single hole, could you? A. No sir.
 
 
 135
 Q. Nor could you compute any grade of ore beyond what was in the core itself? A. You are confined to what is in the core, sir. (This witness did say that it was 'inconceivable to expect the ore would quit immediately outside the drill hole, but you have no way of measuring how far it is going to go except the favorable implication of the anomaly.')
 
 
 136
 From this testimony, the trial court found:
 
 
 137
 'However, all the experts agreed that one drill core does not establish an ore body, much less a mine. Defendants' experts unanimously concluded that there is no way even to estimate the probabilities that one drill core will lead to the discovery of an ore body.' 258 F.Supp. at 282.
 
 
 138
 Despite the experts' virtually uncontradicted testimony, despite Rule 52(a) and despite the Supreme Court's statement of the law, the majority choose to reject the trial court's findings as to the rusults of the first drill core, K-55-1, and to substitute their own expertise in the mining engineering field by holding that 'knowledge of the possibility which surely was more than marginal of the existence of a mine of the vast magnitude indicated by the remarkably rich drill core located rather close to the surface (suggesting mineability by the less expenseive open-pit method) within the confines of a large anomaly (suggesting an extensive region of mineralization) might well have affected the price of TGS stock and would certainly have been an important fact to a reasonable, if speculative, investor in deciding whether he should buy, sell or hold.'
 
 
 139
 Indeed, any such conclusions from a first drill core, if so announced by TGS, would undoubtedly have had a substantial effect on the market price of TGS stock and would have immediately brought forth both the wrath of, and injunction papers from, the Commission charging TGS with issuing false, misleading and unsupported statements to boost the price of the stock.
 
 
 140
 Factually, the premise posed by the majority is 'clearly erroneous.' There was no knowledge of the existence of a 'mine.' Even to the majority in their self-assumed fact-finding role, the 'mine' was only a more than marginal 'possibility.' The testimony was unanimous that no estimate of 'magnitude' could be made. The 'large anomaly' did not suggest 'an extensive region of mineralization' and furthermore TGS did not own or control it in any event. Its area was then limited to its onequarter segment.
 
 
 141
 The majority read the record as conclusively establishing 'that knowledge of the results of the discovery hole, K-55-1, would have been important to a reasonable investor and might have affected the price of the stock.' But disclosure of the 'results', namely, preliminary visual inspection of the contents, would have violated the Commission's own rules and standards. The Commission has specifically declared (Sch. I, Form 1-A, Reg. A offerings under the 1933 Act):
 
 
 142
 'No claim shall be made as to the existence of a body of ore unless it has been sufficiently tested to be properly classified as 'proven' or 'probable' ore, as defined below. If the work done has not established the existence of proven or probable ore, a statement shall be made that no body of commercial ore is known to exist on the property.'
 
 
 143
 Item 8(a)(b), 1 CCH Fed.Sec.L.Rep. P7327.
 
 
 144
 The Commission has carefully defined the scope of sampling required to justify even estimates, as follows:
 
 
 145
 'The trem 'proven ore' means a body of ore so extensively sampled that the risk of failure in continuity of the ore in such body is reduced to a minimum. The term 'probable ore' means ore as to which the risk of failure in continuity is greater than for proven ore, but as to which there is sufficient warrant for assuming continuity of the ore.'
 
 
 146
 Id., Item 8(a)(c), 1 CCH Fed.Sec.L.Rep. P7327.
 
 
 147
 Thus under the Commission's own standards, TGS, if it revealed any information during the November 1963-April 1964 period, would have had to announce to the public in substance 'TGS has drilled a 1 1/8' core on a onequarter section owned by it in Timmins, Canada. Although the core appears to have excellent mineral content 'no body of commercial ore is known to exist on the property." Contrast such a statement with the April 12, 1964 release so criticized by the Commission. Further contrast it with a hypothetical November 1963 press release implicitly suggested by the majority 'TGS as a result of drilling on its property in Canada has knowledge of the more than marginal possibility of a mine of magnitude over an extensive region of remarkably rich mineralization.'-- a statement which under the circumstances and then known facts would have been the height of recklessness.
 
 
 148
 In fact, the Commission itself indulges in the very speculation it condemns for, after conceding that 'the trial court correctly stated that one drill hole does not establish the existence of a commercially mineable mineral deposit,' it straightway contends that the information which arose after the drilling of this first and only (for 4 1/2 months) drill hole revealed such 'chances of imminent success, viewed in the light of the magnitude of the potential economic benefit to Texas Gulf' as to require disclosure by insiders desiring to buy TGS securities.
 
 
 149
 The Commission's position, consistent with its rules and regulations to protect the public from premature announcements which might well arouse speculative fervor are well expressed in its argument before this Court in its brief on appeal in Securities and Exchange Commission v. Great American Industries, Inc., et al., 259 F.Supp. 99, (SD.N.Y.1966), where it said:
 
 
 150
 'Neither the Commission, the sellers nor anyone else knew or could establish the value of the (mining) properties since they had not been explored except in a very preliminary way. No one can prove the value of a largely unexplored mining prospect.' (p. 19)
 
 
 151
 The conservative (and in my opinion proper) approach of the Commission in Great American is reflected in its statement that 'The ore content of a property is never 'known' until the ore has been completely removed and the minerals separated.' This is probably an overstatement because by the time of the TGS April 16, 1964 press release, exploration had advanced to a point where an estimate of the extent of the tonnage might have been rather accurately made. The Commission in that case also stated two truisms (1) that 'it is extremely important that all facts relevant to an estimate of the value of such property be disclosed,' and (2) that 'the judgment of the 'value' of this property is dependent upon the results of exploratory work * * *.' (Great American brief, pp. 22, 23)
 
 
 152
 On November 12, 1963 drilling of K-55-1 was terminated at 655 feet. The core of the drill hole contained relatively high percentages of copper and zinc and some silver, although the percentages at any given point fluctuated widely. This result undoubtedly 'excited the interest' of the TGS exploration team. TGS decided to acquire the surrounding plots in the Kidd 55 area to enable it fully to investigate the anomaly. The attempt to acquire the adjoining properties at reasonable prices (ultimately $52,500) and the strictures on secrecy are customary in the mining industry, especially when dealing with land of a highly uncertain value. After all, TGS had prior experience in exploration where initially promising situations turned out to be 'duds.' For example, the company had spent some $7,000,000 to purchase an underwater dome off the coast of Texas and an additional $1,000,000 to drill 21 holes before concluding that there was not enough sulphur in the dome to be of commercial interest.
 
 
 153
 However, until drilling was resumed, nothing further was learned about the ore content of the property other than as revealed in November and December 1963 from the analysis of K-55-1. The trial court's finding as to this fact is unassailable:
 
 
 154
 'The most that can be said of the individual defendants' knowledge after the drilling of K-55-1 is that they had 'hopes, perhaps with some reason,' that it would lead to a mine. James Blackstone Mem. Lib. Ass'n v. Gulf, M. & O.R. Co., 264 F.2d 445, 450 (7th Cir. 1959). The results of K-55-1 were too 'remote' when considered in light of the size of TGS, the scope of its activities, and the number of its outstanding shares, to have had any significant impact on the market, i.e., to be deemed material.' 258 F.Supp. at 283.
 
 
 155
 This conclusion is amply supported by the record. Kidd 55 was only one of several thousand anomalies (areas where there is unusual variation in the electrical conductivity of rocks) that TGS detected in its aerial exploration of the Canadian shield. Several hundred of these were considered worthy of further study and options on the land around them were acquired. The District Court found that 'TGS had previously drilled 65 equally promising anomalies, but most of them had revealed either barren pyrite or graphite, while a few had shown marginal mineral deposits in insufficient quantities to be commercially mined.' (258 F.Supp. at 271).
 
 
 156
 Against this factual background, what position should have been taken by those few officers and employees of TGS after they knew of the core, K-55-1, and the reports thereon made after visual inspection and analysis? There were several choices. Knowing that the nature and extent of this prospect could not be measured until further exploration was conducted and that further exploration had to await additional land acquisition they could have made no announcement as was the case here.
 
 
 157
 Turning now to the hypothesis of disclosure: As previously stated, any announcement of the discovery of a remarkable mine would have been both false and misleading. The Commission, however, impliedly suggests for affirmative answer the question: 'Whether the chances of imminent success, viewed in the light of the magnitude of the potential economic benefit to Texas Gulf' did not require disclosure by insiders of the status of the drilling (then only the first hole, K-55-1)? In the field of speculation, it would be interesting to know the position the Commission would have taken if TGS had announced that K-55-1 was 'one of the most impressive drill holes completed in modern times' and that it 'is just beyond your wildest imagination' (SEC Brief, p. 25). It requires no imagination to venture that such announcements might well have had the 'wildest' impact on the market price of TGS stock.
 
 
 158
 Assuming the majority's and the Commission's full disclosure theory, would the facts as then developed have given the buying or selling public the so-called advantages possessed by the insiders? TGS could have announced by November 15, 1963 that it had completed a first exploratory hole, the core of which by visual examination revealed over a length of 599 of 655 feet drilled, an average copper content of 1.15%, zinc 8.64% Or, had TGS waited until mid-December, by chemical analysis 1,18% Copper, 8.26% Zinc and 2.94% Ounces of silver per ton; that TGS would try to acquire the other three-quarters of the segment unless the announcement boosted prices to unwarranted heights; that if the property could be acquired further exploratory holes would be drilled to ascertain the nature and extent, if any, of the ore body; that reports of developments would be made from time to time but that the SEC had indicated that TGS should advise its stockholders and the public that there was no proof as yet that a body of commercial ore exists on the property. Such an announcement would, of course, have been of no value to anyone except possibly a few graduates of Institutes of Technology and they, as the expert witnesses here, would have recognized that one drill hole does not reveal a commercially profitable mine.
 
 
 159
 The final question to be answered is: were these officers and employees disqualified as the result of possessing information gleaned by the first drill core from purchasing TGS stock? The number of possibilities for Congressional legislation and Commission rulings are legion. They extend over a gamut between definite extremes. At one extreme is a rule that no officer or employee or any member of their families shall own stock of the company for which they work or purchase stock if he possesses 'material' inside information. This assumption raises the question of what is material and who is to make such a determination. Materiality must depend upon the facts and their resolution is for the fact-finder, court or jury. The majority state that the K-55-1 drilling results were material because they 'might well have affected the price of TGS stock.' But such a statement could be made of almost any fact related to TGS. If a labor strike had kept its plants idle for months, encouraging news of a possible settlement hoped for by the TGS labor negotiators might cause the negotiators to buy. Their belief that the strike would be protracted might cause them to sell. Either announcement might well have affected the market and would to those who bought or sold have seemed misleading and deceptive if the anticipated event did not come to pass. Yet the requirement of hourly bulletins to the press from the conference room would not be compatible with common sense. Scores of day by day intra-company situations come to mind which in the individual opinions of company officers or employees might well affect the price of TGS stock, each individual reacting according to his own judgment. However, companies listed on a national exchange can scarcely broadcast to the nation on a daily basis their hopes and/or expectations from the developments in, for example, their research departments. An even more striking illustration would be found within the structure of a large pharmaceutical company where discoveries of panaceas to cure human disease occupies the workdays of thousands of scientists. Premature announcements of important discoveries would be branded as false and misleading if unfulfilled and all stock purchases made during the course of the research, if ultimately successful would be said to have been made with the advantage of inside information. At the other extreme is an equally easy-to-resolve Cady, Roberts[1] situation where a definite fact (the reduction of the dividend) was known by an insider, who participated in the meeting where the decision had already been made, whose knowledge of the probable reaction of the market to such an announcement, namely, a substantial sell-off, caused him to leave the meeting ahead of everyone else and before the potential buyers learned of the bad news to foist his selling orders on the market and his stock on uninformed purchasers. Between these extremes there should be a rule of reason.
 
 
 160
 Faced with this problem, the trial court selected a period from November 12, 1963 (the first information) to some date after drilling was resumed when it might reasonably be said that a body of commercially mineable ore might exist. The trial court, accepting the Commission's experts' version, fixed 7:00 p.m. on April 9, 1964 as the time when TGS had material information which 'if disclosed, would have had a substantial impact on the market price of TGS stock' but also found that 'the drilling results up to 7:00 p.m. on April 9th did not provide such material information.' These findings are clearly supported by the proof upon which the court relied.
 
 
 161
 Practically all TGS stock in question here was purchased between November 12, 1963 and April 8, 1964. What were the motives behind each of the purchases? Obviously, a subjective approach presents difficulties. A myriad of reasons would be given-- hope that a commercially profitable mine would be found if further exploration proved the ore to be as promising as the core of K-55-1 (November 12, 1963); the development of a phosphate profect and potash mine (November 15, 1963); the prediction of security analysts that there would be a turnabout in the price of sulphur stocks; the acquisition of Canadian oil properties (December 16, 1963); the new high level of free world sulphur use and output (December 30, 1963); the launching of the world's largest liquid sulphur tanker (December 30, 1963); the entry into service of a large liquid sulphur tanker for domestic shipments (January 18, 1964); the sulphur expansion program in Canada (February 8, 1964); the new fouryear high in sales reached in 1963 (February 20, 1964); and the $2 per ton price increase for sulphur (April 1, 1964).
 
 
 162
 There can be little doubt but that those familiar with the results of K-55-1 were influenced thereby in making their purchases. The conclusion of the majority is based primarily on this assumption. They call it 'a major factor in determining whether the K-55-1 discovery was a material fact' and say that this 'virtually compels the inference that the insiders were influenced by the drilling results.' To them, completely disregarding the trial court's findings and substituting themselves as a jury, these purchases are 'the only truly objective evidence of the materiality of the K-55-1 discovery.' In so holding, they confuse the inducing motive of the individual purchaser with knowledge of material facts which ought to be revealed to the public at large. The inconsistency of the majority's position is immediately apparent. Those who purchased were apparently willing on the basis of the inconclusive first hole and other information to risk a certain amount of their funds in TGS stock, hopeful that future developments would be favorable. Their motive for purchase does not establish the materiality of the facts which influenced them. However, the importance of this case to the corporate and financial community centers around the news release, its timing and its content. It is unfortunate that the atmosphere surrounding this important issue has been so colored and in the collective mind of the majority so contaminated by the comparatively insignificant stock purchase issue.
 
 
 163
 The resolution, if such be possible, of the many problems presented in this field should be by rule, as definite as possible, formulated in the light of reality and not retroactive in effect as here. I understand that the Commission has conducted, or is conducting, hearings to enable it to learn the views of the many persons and corporations affected. Presumably the Commission will make recommendations to the Congress to give that body an opportunity to accept or reject after thoughtful debate such proposals as may be made. The companies, the securities of which are listed on exchanges, their employees and investing public alike should have some knowledge of the rules which will govern their actions. They should not be forced, despite an exercise of the best judgment, to act at their peril or refrain in terrorem from acting. As to a waiting period after the information regarded as 'material' has been disclosed, any such time period should be specifically fixed by Congressional or Commission rule not retroactive in application. There is no proof here that the purchases of the defendants, even if motivated by hopes not then solidly grounded, raised or lowered the market or were manipulative, misleading, deceptive or were accomplished by false or fraudulent devices. The trial court after hearing and seeing the witnesses has resolved these factual issues and in my opinion its decision should be sustained.
 
 Stock Options
 
 164
 On February 20, 1964 the stock option committee, which was not informed of the developments at Kidd 55, granted options to Stephens, Fogarty, Mollison, Holyk, Kline and a number of other top officers of TGS. Since only K-55-1 had been drilled at that point, the District Court correctly held that there was no duty of disclosure on the part of those receiving the options. Assuming arguendo that the information was material, those not in top management have no duty to disclose to the directors information already reported to their own superiors since they may reasonably assume that the information has been conveyed to the directors on the stock option committee. The District Court held that Holyk, Mollison and Kline were not in top management and that Kline was ignorant of the details of the drilling results, so as to them no violation of 10b-5 had been made out. The majority disagree as to Kline, placing him in top management along with Stephens and Fogarty, and holding that he had sufficient knowledge that his non-disclosure violated Rule 10b-5. Since the majority admit that Kline knew only that a hole containing favorable bodies of copper and zinc ore had been drilled in Timmins, it seems clear that he did not possess material information that had to be disclosed. That being the case, I find it unnecessary to decide whether or not Kline was in 'top management.'
 
 
 165
 As to Stephens and Fogarty, the majority decision places insider recipients of stock options in a difficult dilemma. Under the majority's decision, an insider must perform the uncommon act of refusing such an option, promoting speculation as to the reasons therefor, or accept the option and face possible 10b-5 liability. The objective of protecting a corporation from selling securities to insiders at a price below their true worth is fully served by requiring nondisclosing insiders to abstain, not from accepting the stock options, but merely from exercising them-- an event likely to occur after the inside information has become public. In any case, the failure to exercise an option is less likely to suggest that the insider possessed material information than the failure to accept such an option. Since the option granted to Kline had not been exercised prior to its ratification by the Texas Gulf directors on July 15, 1965, after full disclosure, there can be no 10b-5 violation as to him, and rescission of the option he received should not be ordered. As Stephens and Fogarty have surrendered the options and the corporation has canceled them, there has certainly been no violation of 10b-5 by them with respect to those options.
 
 The April 12, 1964 Press Release
 
 166
 The majority suggest with, in my opinion, most remarkable business naivete that, instead of the April 12, 1964 press release which the trial court had found as a matter of fact had been issued in the exercise of 'reasonable business judgment under the circumstances,' in their 1968 judgment 'it would have obviously been better to have specifically described the known drilling progress as of April 10th by stating the basic facts.' They also suggest that 'such an explicit disclosure would have permitted the investing public to evaluate the 'prospect' of a mine at Timmins without having to read between the lines to understand that preliminary indications were favorable-- in itself an understatement.' Had TGS followed this ex post facto directive, it first would have had to find some news medium capable of reaching the nation's potential investing public and willing to publish a mass to metallurgical reports disclosing the 'basic facts.' Any such procedure would have invited the initial question on cross-examination of TGS officials: How could any such 'explicit disclosure' have permitted the investing public to evaluate the prospect of a mine, without the necessity of transmitting it for expert opinion to some School of Mines? Of course there would be but one answer: It could not.
 
 
 167
 The facts as established between the date of the resumption of drilling and the drafting of the release are as follows:
 
 
 168
 On March 31, 1964 TGS moved four drill rigs onto the property, and by April 10th all were in operation. On Friday morning, April 10th, Mollison and Holyk visited the property and learned the results of the drilling up to that time. Mollison left for New York that evening, arriving on Saturday morning. Holyk left for New York Saturday morning and arrived that same day. Until Saturday morning TGS did not intend to issue a press release on the progress of the exploration.
 
 
 169
 Despite rumors in the Canadian press that TGS had made a major discovery, Lamont had advised Stephens 'that TGS should take no action unless the rumors reached the New York press or until TGS had sufficient information available to issue an appropriate press release.' 258 F.Supp. at 293. On Saturday morning, April 11th, both the New York Herald Tribune and the New York Times prominently reported a major ore discovery. In a front page article carrying the title 'Canada's Copper Rush' the Herald Tribune stated 'The biggest ore strike since gold was discovered more than 60 years ago in Canada has stampeded speculators to the snowbound old mining city of Timmins * * *.' The article also stated that the richness of the copper was so great that the core was flown out of the country to be assayed and that four more drill rigs were scheduled to start working the following week. All of these statements were inaccurate and a matter of concern to Fogarty and Stephens.[2] Stephens advised Fogarty that TGS should issue a press release to clarify the rumors that Fogarty therefore contacted Mollison who had just returned from Timmins.
 
 
 170
 Mollison had been advised by Holyk as to the drilling results up to 7:00 p.m. on April 10th. On the basis of this information he, as an experienced mining engineer, did not feel that there was sufficient information to draw conclusions as to size and grade of ore, and he advised Fogarty accordingly.
 
 The District Court held:
 
 171
 'In seeking the advice of Mollison, the head of TGS's exploration group, in consulting with TGS's public relations firm, and in clearing the release with one of TGS's lawyers, Stephens and Fogarty exercised reasonable business judgment under the circumstances.' 258 F.Supp. at 296.
 
 
 172
 The press release was drawn up with the aid of the above-mentioned persons on Saturday and Sunday morning, and was delivered to the press on Sunday for publication in the Monday papers. It stated in part:
 
 
 173
 'Recent drilling on one ore property near Timmins has led to preliminary indications that more drilling would be required for proper evaluation of this prospect. The drilling done to date has not been conclusive, but the statements made by many outside quarters are unreliable and include information and figures that are not available to TGS.
 
 
 174
 'The work done to date has not been sufficient to reach definite conclusions and any statement as to size and grade of ore would be premature and possibly misleading. When we have progressed to the point where reasonable and logical conclusions can be made, TGS will issue a definite statement to its stockholders and to the public in order to clarify the Timmins project.'
 
 
 175
 The majority offer suggestions for improving the press release, but, as their editorial skills and present appraisal of the then mining situation were not available when it was drafted, the relevant issue is whether the District Court was in error in determining that the release was accurate and not misleading.
 
 
 176
 By 7:00 p.m., April 10, the following data was available:
 
 
 177
 1. geologists' logs of visual estimate and chemical assay of the results of K-55-1,
 
 
 178
 2. preliminary estimates of 757 feet of K-55-3 and unrecorded visual estimates of 569 feet of K-55-6, both drilled on the same line as K-55-1 (2400 S),
 
 
 179
 3. unrecorded visual appraisals of 476 feet of K-55-4, drilled 200 feet to the south of K-55-1, and
 
 
 180
 4. unrecorded visual appraisals of only 97 feet of K-55-5, drilled 200 feet to the north of K-55-1.
 
 
 181
 The Commission's experts testified that because copper and zinc had been found in these five holes (although in varying percentages) it could reasonably be concluded that the mineralization was continuous between holes 400 feet apart and also 100 feet byond in each direction and to a depth of 600 feet, one hundred feet below the deepest hole. However, the District Court found that:
 
 
 182
 'TGS's experts were unanimously of the opinion that at 7:00 p.m. on April 10 the Kidd 55 segment was still a prospect and that no estimates as to proven or probable ore could be made. They all agreed that the April 12 press release accurately set forth the situation as it was known at the time. None thought that TGS could have estimated proven ore, and the Commission's expert, Pennebaker, agreed that this was a matter on which there could be differences of opinion. Defendants' experts testified that on the basis of the drilling to that time there was no assurance of continuity in the mineralized zone and that, without further drilling, the results of one hole could not be correlated with the results of others.' 258 F.Supp. at 295.
 
 
 183
 The April 12 release therefore correctly described Kidd 55 as a 'prospect.' While that term is a word of art in the mining trade used to describe 'a property where there is no assurance, from the information known, that a commercially mineable ore body exists' (Pennebaker), its technical definition is no different from the definition in common use. See Webster's New International Dictionary (2d ed. unabridged 1960). Nor is there any inconsistency between the release and the District Court finding that as of April 9, 1964, 'there was real evidence that a body of commercially mineable ore might exist.' 258 F.Supp. at 282. The District Court characterized the press release as an accurate portrayal of the situation as it was known at that time. The inference is therefore inescapable that the Court felt that a reasonable investor would not be misled by it. The Commission's whole argument appears to be that the release should have been more optimistic (if conclusions were to be used at all), and that it should have referred to Kidd 55 as having 'proven' or 'probable' ore. But such a press release would have been highly misleading since the information necessary to draw such conclusions was not available on April 10-- according to the TGS witnesses whom the District Court chose to believe.
 
 
 184
 As evidence that the April 12 release was probably inaccurate, the majority point to the fact that only three days later TGS prepared the April 16 release which announced a major mineral discovery. However, this release was based on more information of significance than was available on April 10 at 7:00 p.m. Between April 12 and April 15 five additional holes had been drilled, K-55-5, 6, 7, 8 and 10 and by April 15 at 7:00 p.m. 5198 feet of core had been drilled compared with 2776 feet on April 10. Furthermore, the location of drilling holes is critical in determining continuity. Most of the footage drilled by April 10 had been in a single plane (2400 S), but by April 15 drilling had established mineralization in a number of additional planes. There is therefore no inconsistency in the statements made and the conclusions reached in the two releases.
 
 
 185
 The majority remand for a determination of the effect of the April 12 release on a reasonable investor because 'they cannot 'definitively conclude that it was deceptive or misleading to the reasonable investor, or that he would have been misled by it." The evidence of the actual effect of the release on investors was at best inconclusive. The Commission offered no proof that anyone was misled by the release-- e.g. testimony tending to show that most investors thought the release meant that TGS had no hopes of making an ore discovery. Those that had been advised by the broker Roche to purchase stock did not sell upon reading the April 12 release. Several brokers testified that they interpreted the release as affirmative and encouraging. The market opened at 30 1/8 on the 13th (when the release became public) and closed at 30 7/8-- scarcely a sign of public pessimism. The next day the market closed at 30 1/4. The District Court correctly found that 'the issuance of the release produced no unusual market action.' 258 F.Supp. at 294. Nor did he find the release to be 'gloomy.' His statement was that: 'While, in retrospect, the press release may appear gloomy or incomplete, this does not make it misleading or deceptive on the basis of the facts then known.' 258 F.Supp. at 296. With the aid of hindsight the release may indeed seem gloomy, but that is because it is now known that a very substantial tonnage of ore exists. Hindsight, however, is not the test. Furthermore, even if some investors considered the release to be discouraging compared to the rumors afloat, if the facts and conclusions presented were accurate (as they were) and if they were not presented in a manner that would mislead a reasonable investor (which they were not) then there can be no violation of 10b-5.
 
 
 186
 The District Court aptly pointed out that in quelling the rumors TGS had to proceed with caution:
 
 
 187
 'If they said too much, they would have been open to criticism and possible liability if it turned out that TGS had not discovered a commercial mine. If they said too little and later announced a mine, they subjected themselves to the charge that their press release was misleading or deceptive-- and, indeed, this is what has happened.' 258 F.Supp. at 296.
 
 
 188
 While it thus might have been 'safer' for TGS to have issued a sheaf of drilling results and mineral analyses (which the press would probably have declined to print), 'they would have (thereby) encouraged the rumor mill which they were seeking to allay.' (Ibid.) Stephens and Fogarty decided that the best course was to give their evaluation of the situation-- a reasonable business judgment that should not incur 10b-5 liability unless their evaluation was either false or misleading. The experts which the trial court credited were of the opinion that Kidd 55 was accurately portrayed as a prospect which required further exploration. The trial court found that the release was not 'misleading or deceptive on the basis of the facts then known,' and the majority state that from the record they cannot 'definitively conclude that it was deceptive or misleading to the reasonable investor.' It would therefore appear that the Commission has failed in its burden of proof, unless it can be said that TGS was negligent in not obtaining later data from Timmins before issuing the release.[3]
 
 
 189
 Of necessity the April 12 press release had to be issued on the basis of the drilling results through 7:00 p.m., April 10, and it seems clear that the trial court determined that it would not be reasonable to charge TGS with knowledge of later information. While additional drilling was done on Saturday and Sunday, April 11 and 12, the cores had not been seen by the geologists advising management, and there was no way of communicating with the drill site even if someone had been available there to give a reliable appraisal. Mollison and Holyk were in New York for the weekend, and there was no telephone at the site-- the only way to communicate with the site was to go there. The decision to issue a press release was not made until Saturday, at which point Fogarty testified it 'would just be very difficult for us to try to find anyone in Timmins.' The statement was released Sunday afternoon and Mollison and Holyk were asked 'to return to Timmins as promptly as possible and to move things along.' It therefore cannot be said that TGS was negligent in not obtaining more current data, and it is certainly not negligent simply because it decided to issue the statement when it did. A remand on this point is therefore not justified.
 
 
 190
 The 'in connection with' Clause Precludes the Imposition of 10(b) Liability on TGS.
 
 
 191
 In any event, the Commission still has the problem of showing that the other requirement of the statute and rule is met, namely that the release was issued 'in connection with' a securities transaction on the part of TGS. This requirement is explicit in 10(b) of the Act (15 U.S.C. 78j) which provides:
 
 
 192
 It shall be unlawful for any person * * *
 
 
 193
 (b) To use, or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 
 
 194
 Pursuant to this authority the Commission in 1942 promulgated Rule 10b-5 (17 C.F.R. 240.10b-5) which states:
 
 
 195
 Employment of Manipulative and Deceptive Devices
 
 
 196
 It shall be unlawful for any person * * *
 
 
 197
 (a) to employ any device, scheme, or artifice to defraud,
 
 
 198
 (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 
 
 199
 (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
 
 
 200
 In determining whether the requisite 'connection' to a securities transaction was present in this case, the District Court found:
 
 
 201
 'From the foregoing, it is apparent that the purpose of the April 12 press release was an attempt to meet the rumors which were circulating with respect to the Kidd 55 segment. There is no evidence that TGS derived any direct benefit from the issuance of the press release or that any of the defendants who participated in its preparation used it to their personal advantage. The issuance of the release produced no unusual market action. In the absence of a showing that the purpose of the April 12 press release was to affect the market price of TGS stock to the advantage of TGS or its insiders, the issuance of the press release did not constitute a violation of Section 10(b) or Rule 10b-5 since it was not issued 'in connection with the purchase or sale of any security." 258 F.Supp. at 294.
 
 
 202
 The District Court held taht if TGS or its insiders had purchased TGS stock after issuing the allegedly misleading press release, the inference could be drawn that it was issued to reduce the price of the stock to facilitate purchases at bargain prices. Such a deceptive or manipulative practice would be prohibited by 10(b) and Rule 10b-5. See Gann v. Bernz-Omatic, 262 F.Supp. 301 (SDNY 1966); Cochran v. Channing Corp., 211 F.Supp. 239 (SDNY 1962). Moreover, noting that the 'in connection' clause has been broadly construed, the District Court did not require that stock purchases by TGS or insiders be shown. Instead, the court held that 'the issuance of a false and misleading press release may constitute a violation of Section 10(b) and Rule 10b-5 if its purpose is to affect the market price of the company's stock to the advantage of the company or its insiders. Freed v. Szabo Food Serv., Inc., CCH FED.SEC.L.REP. P91,317 (N.D.Ill.1964).' 258 F.Supp. at 293. Thus, even if TGS or its insiders had not engaged in securities transactions, if there were evidence from which it could be inferred that the press release was intentionally issued to depress the price of the stock as part of some fraudulent scheme, a 10b-5 violation would have been stated.[4] But in this case the only purpose of the press release was to quell the extravagant rumors circulating about the Canadian exploration project. No facts whatsoever were adduced which would have justified a finding that the release was issued for a fraudulent or manipulative purpose. To hold that such a statement incurs 10b-5 liability is contrary to the intent of Congress in passing 10(b) and settled judicial construction. Furthermore, such a holding might well have the unfortunate result of deterring the dissemination of corporate news despite the strong policy underlying all securities legislation of encouraging disclosure of information useful to present and potential investors. If press releases have to read like prospectuses to guard against possible 10b-5 liability, it is safe to predict that they will quickly fall out of favor with corporate management.
 
 
 203
 The Commission advances the argument (successful with the majority) that the 'in connection' requirement is satisfied by the mere fact that the public is purchasing and selling securities on the open market. Thus any statement issued by a publicly listed company is made 'in connection' with the purchase or sale of securities. The majority approve of this interpretation because 'the investing public may be injured as much by one's misleading statement containing inaccuracies caused by negligence as by a misleading statement published intentionally to further a wrongful purpose.' However, the fact remains that 10(b) of the Securities Exchange Act was not passed to protect investors from the former type on injury, but leaves liability for such misrepresentation up to state law, which is well equipped to handle any such situation. See, e.g., Note, Accountant's Liabilities for False and Misleading Statements, 67 Colum.L.Rev. 1437 (1967). Section 10(b) was certainly not intended to be a mandate to the Commission to erect a comprehensive regulatory system policing all corporate publicity, as the majority now contend. The legislative history clearly reveals that the stateute was passed to prohibit deceptive and manipulative devices used in connection with securities transactions, and that the 'connection' between the complained of conduct and the securities transactions must be a closer one than the majority now sanctions. See S.Rep.No.792, 73rd Cong., 2d Sess. (1934); H.R.Rep.No.1383, 73rd Cong., 2d Sess. (1934); S.Rep.No.1455, 73rd Cong., 2d Sess. (1934); Comment, 74 Yale L.J. 658, 681-82 (1965).
 
 
 204
 The broad congressional purpose in passing the Securities Exchange Act of 1934 is set forth by Thomas G. Corcoran, one of the draftsmen of the bill that became the 1934 Act. He stated at a 1934 House hearing that 'this bill has at bottom five ideas in it, and all 36 pages tie in around the five ideas.' According to Corcoran these five ideas were (1) control on the amount of credit, (2) control of manipulations, (3) control of insider trading (16(b)), (4) elimination of abuses in the market machinery, and (5) the establishment of the Securities Exchange Commission to administer the Act. As to manipulation, he testified that:
 
 
 205
 'As I will point out later, there are only a very few real battlegrounds in this act. Manipulation is not one of them. The provisons of this bill, as to manipulations upon stock exchanges, are agreed to practically everywhere, * * * Matched orders, washed sales, pools, options-- all of the rest of them are out. So, control of manipulative practices is really not something your committee has to thrash out around this table.'[5]
 
 
 206
 It is therefore not surprising that there is little discussion in the legislative history as to the meaning of the language in the anti-manipulation provisions. It was obviously thought that sections outlawing devices that had been shown at great length to be deleterious did not require any lengthy explication. This is unfortunate because it has resulted in 10(b) being given a construction and significance which, in my opinion, Congress did not foresee and did not intend.
 
 
 207
 This conclusion is fortified by the provisions of the Act dealing with manipulation since the more specific prohibitions make it clear what evils Congress intended to eradicate by 10(b). Section 9, 15 U.S.C. 78i provides that it shall be unlawful for any broker, dealer or other person to create a false or misleading appearance of activity in the market for a stock or to attempt to affect the price of a stock by certain specific manipulative devices.
 
 Section 10(a), 15 U.S.C. 78i provides:
 Manipulative and Deceptive Devices
 
 208
 It shall be unlawful for any person * * *
 
 
 209
 (a) To effect a short sale, or to use or employ any stop-loss order in connection with the purchase or sale, of any security registered on a national securities exchange, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 
 
 210
 Read in context it seems clear that 10 (b) was only meant to be a supplement to the specific prohibitions contained in 9 and 10(a). Commenting on the section that became 10(b), Corcoran stated:
 
 
 211
 'Subsection (b) says, 'Thou shalt not devise any other cunning devices.' * * * Of course subsection (b) is a catch-all clause to prevent manipulative devices. I do not think there is any objection to that kind of a clause. The Commission should have the authority to deal with new manipulative devices.'
 
 
 212
 Since the manipulative devices outlawed by 9 all involve fraudulent activities integrally related to securities transactions, the conclusion necessarily follows that the 'other cunning devices' sought to be prohibited by 10(b) and Rule 10b-5 are those which also involve securities transactions as an integral part of the fraud. The statute as enacted requires that the fraudulent scheme be 'in connection with the purchase or sale of any security.' The expression 'in connection' is used elsewhere in the Act, including 9(b), as a shorthand method of indicating that the activity sought to be made illegal is that having a direct relation to securities transactions. The majority read the phrase as merely requiring that the allegedly misleading statement be issued by a publicly traded corporation. They argue that the 'connection' that has to exist between a corporate statement and a security transaction is supplied by the theoretical argument that every 'material' corporate statement presumably affects the market price of the issuer's securities. In my opinion such a broad interpretation of the statute is unwarranted as a matter of statutory construction and unwise as a matter of policy.
 
 
 213
 Congress has made it clear in the other antifraud provisions of general application that its concern was not with allegedly misleading corporate publicity but rather with purposeful schemes to deceive and defraud the public by means of manipulative and deceptive devices which directly involve purchases or sales of securities. Thus 12(a), 15 U.S.C. 77l of the 1933 Act provides that any person who 'offers or sells a security' by means of a prospectus or oral communication which includes a misstatement or omission of a material fact shall be civilly liable. Similarly 17(a) of the 1933 Act, 15 U.S.C. 77q(a), provides that it 'shall be unlawful for any person in the offer or sale of any securities' to engage in fraudulent activity.
 
 
 214
 A further insight into the proper scope of 10b-5 can be gained by examining 17(a), 15 U.S.C. 77q(a) which is almost word for word the same except for the explicit requirement that any alleged fraud be associated with 'the offer or sale of * * * securities.' The only difference of substance between 17(a) and Rule 10b-5 is that the latter applies to purchasers as well as sellers. Ellis v. Carter, 291 F.2d 270, 272-274 (9th Cir. 1961); SEC Sec.Exch.Act Rel. No. 3230 (May 21, 1942) ('The new rule closes a loophole in the protection against fraud administered by the Commission by prohibiting individuals or companies from buying securities if they engage in fraud in their purchase,'); Milton Cohen, 'Truth in Securities Revisited,' 79 Harv.L.Rev. 1340, 1364 (1966).
 
 
 215
 Finally, 15(c)(1), (2), 15 U.S.C. 78o(c)(1), (2) provides that no broker or dealer shall (1) induce the purchase or sale of any security by means of any manipulative, deceptive or other fraudulent contrivance or (2) attempt to induce the purchase or sale of any security 'in connection with which such broker or dealer engages in any fraudulent, deceptive, or manipulative act or practice * * *.'
 
 
 216
 The majority argue that when compared with the above provisions the slight change of wording in 10(b)-- the insertion of the phrase 'in connection with * * *'-- indicates that Congress intended a revolutionary change in the whole thrust of the securities laws. That is too slim a basis to support a judicial excursion over such uncharted seas. It is most doubtful that Congress intended such a result, and the merits of such a change are so unexplored that Congress should certainly be consulted before making it.
 
 
 217
 The majority support their action in part by a long quotation from H.R.Rep.No.1383. It should be noted that the discussion at that point of the report is not addressed to 10(b) but to the reporting and disclosure provisions of Securities Exchange Act of 1934, specifically 12-14, 16. Section 12 of the Act, 15 U.S.C. 78l, requires the registration of securities traded on a stock exchange and of certain other widely held securities. Detailed information similar to that required by the 1933 Act has to be filed with the Commission for such registered securities, and this information is required by 13, 15 U.S.C. 78m, to be kept 'reasonably current' by periodic and other reports filed with the Commission and the stock exchanges. In addition 16(a), 15 U.S.C. 78p(a), requires certain officers, directors and major shareholders to file reports with the Commission and the stock exchanges as to their initial holdings of stock and subsequent changes. Finally, pursuant to 14, 15 U.S.C. 78n, the Commission has promulgated proxy rules setting forth information that must be sent to shareholders prior to their annual or other meetings. See Schedules 14A-14C, 17 C.F.R. 240.14a-101-103.
 
 
 218
 To encourage compliance with these disclosure and reporting requirements, Congress enacted civil (18, 15 U.S.C. 78r) and criminal (32, 15 U.S.C. 78ff) provisions. A close reading of 18 will demonstrate that a plaintiff proceeding under that section (as opposed to 10(b)) does not have to show that the misleading statement was issued by a person (or corporation) who engaged or participated in a securities transaction or even that the misstatement was intended to influence securities transactions as part of some fraudulent scheme. Therefore, the statements in the legislative history applicable to the reporting and disclosure provisions have no bearing on the correct interpretation of 10(b). That section was not meant to be an auxiliary disclosure device or a provision to punish those who issue inaccurate statements in newspapers or documents filed with the Commission unless they are fraudulent acts integrally connected with securities transactions. If there is no such connection, investors are relegated to 18 or state law to recover their losses and the Commission must use its other remedies, discussed infra.
 
 
 219
 In discussing Rule 10b-5 Cohen expressed concern which, as a result of the majority opinion, seems to have been well founded, that Rule 10b-5 would be given an 'unwarranted' extension. In 'Truth in Securities Revisited,' op. cit. supra, at 1366, he said:
 
 
 220
 'Nor is it clear that Rule 10b-5 will not be read as providing an alternative remedy (alternative to the considerably more limited express remedy of section 18) for false or misleading statements in filing under sections 12 and 13. One might regard these as surprising and even unwarranted extensions of Congress's terse proscription of 'any manipulative or deceptive device or contrivance' in section 10(b) and yet not care to predict confidently that the momentum of decisions will not carry this far.'
 
 
 221
 '* * * I firmly believe that whatever inadequacy is found in 18, as the basic civil liability provision applicable to the continuous disclosure system, ought to be taken care of by direct amendment of the section itself, not by resorting to the broader, vaguer, but (in my view) otherwise directed provisions of Rule 10b-5. I believe that the problem of misrepresentation in a registrant's (issuer's) required filings is quite distinct from the problem of fraud or misrepresentation by a purchaser or seller of a security (even though the two areas sometimes overlap), and that more mischief than good is likely to come from confusing them or treating them as interchangeable.' (Cohen, op. cit. supra at 1370, n. 89)
 
 
 222
 The majority opinion must also be considered in light of its overall impact before a decision can be reached as to its advisability (assuming that the power to interpret 10(b) is as unlimited as the majority apparently believe). It should be realized that the construction given 10b-5 will turn it into a comprehensive regulatory provision applicable to all corporate and individual statements, but without any of the detailed standards necessary to implement such a program. The Commission is presently arguing that 10b-5 is applicable to all corporate statements disseminated to the public or filed with the Commission. See S.E.C. v. Great American Industries, Inc., 259 F.Supp. 99 (S.D.N.Y.1966), appeal pending; Heit v. Weitzen, 260 F.Supp. 598 (S.D.N.Y.1966), Howard v. Levine, 262 F.Supp. 643 (S.D.N.Y.1965), consolidated appeal pending sub nom. Heit v. Weitzen (amicus curiae). The majority opinion appears to approve of the Commission's position without reservation.
 
 
 223
 The Commission's arsenal of weapons for fighting misleading statements has certainly not been shown to be insufficient for it to carry out the tasks that Congress assigned to it. Rule 10b-5 remains a potent method of proceeding against fraudulent schemes which involve securities transactions for both the Commission and private investors. The Commission can also obtain injunctions to enforce compliance with the disclosure and other provisions of the Securities Exchange Act (21, 15 U.S.C. 78u), and stiff criminal penalties are provided for failure to comply with the statute or rules promulgated thereunder (32, U.S.C. 78ff). The Commission can suspend trading for successive periods of 10 days in any security which it feels is being affected by misleading press releases (15(c)(5), 19(a)(4), 15 U.S.C. 78o(c)(5), 78s(a)(4)). For an example of the effective use of this latter power see SEC Sec.Exch.Act Rel. No. 7741 (Nov. 4, 1965) relating to suspension in trading of Belock Instrument Corporation, a defendant in Heit v. Weitzen, supra. Finally, when faced with the repeated issuance of misleading press releases, the courts can without more proof draw the inference that they were purposefully distributed to affect the price of the issuer's securities, justifying injunctive relief under 10b-5 and possibly other remedies. See SEC v. Electrogen Industries, Inc., 68 Civ. 23 (E.D.N.Y. Feb. 26, 1968). In any event if the Commission feels that its arsenal should be augmented, Congress not the courts is the proper forum for its arguments.
 
 Other Judicial Interpretation
 
 224
 The construction given the 'in connection' clause by the District Court has been followed in the many cases that have considered the point. See SEC v. North American Research & Development Corp., 280 F.Supp. 106 (S.D.N.Y. Feb. 8, 1968); Puharich v. Borders Electronics Co., Inc., 1968 Fed.Sec.L.Rep. P92, 141 (S.D.N.Y. Jan. 24, 1968); Howard v. Levine, 262 F.Supp. 643 (S.D.N.Y.1965), appeal pending; Gann v. BernzOmatic, 262 F.Supp. 301 (S.D.N.Y. 1966) (dictum); Heit v. Weitzen, 260 F.Supp. 598 (S.D.N.Y. 1966), appeal pending.
 
 
 225
 It is of course true, as the Commission points out, that the 'in connection' clause has been given a broad construction by the courts in line with the remedial nature of securities legislation (see SEC v. Capital Gains Bureau, 375 U.S. 180, 195, 84 S.Ct. 275, 11 L.Ed.2d 237 (1965); cf. Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967)), but no case supports the Commission's position that it is in effect meaningless. The cases to date have involved defendants who if not actually purchasing or selling securities at least participated in a direct manner in a securities fraud.[6] Thus one who conspires with or aids and abets another in the fraudulent purchase or sale of securities may have the needed connection. See Pettit v. American Stock Exchange, 217 F.Supp. 21 (S.D.N.Y. 1963) (Defendant Exchange and its officers allegedly aided and abetted an illegal distribution of stock by its failure to take necessary disciplinary actions against abusive conduct and practices of its employees of which they knew or should have known. Held: sufficient allegation of fraud under 10b-5); Brennan v. Midwestern United Life Ins. Co., 259 F.Supp. 673 (N.D.Indiana 1966) (Defendant corporation allegedly aided and abetted an alleged violation of 10b-5 by its brokerage firm because of its failure to report the improper activities of said firm to the proper authorities. Held: cause of action stated under 10b-5).
 
 
 226
 Similarly, corporate officers or directors may be liable for causing their corporation to engage in securities transactions. See Ruckle v. Roto American Corp., 339 F.2d 24 (2d Cir. 1964) (Corporation allegedly defrauded into issuing securities to its President through the failure or refusal of some of its directors fully to disclose to the remaining directors material facts concerning the transactions or the financial condition of the company); Bredehoeft v. Cornell, 260 F.Supp. 557 (D.Ore.1966) (Plaintiff induced to sell his stock to the corporation for less than its true value because the defendants, stockholders and directors of the company fraudulently concealed material facts); New Park Mining Co. v. Cranmer, 225 F.Supp. 261 (S.D.N.Y. 1963) (Defendant caused plaintiff corporations, of which they were officers, to issue stock for property which was worth much less than the stock); cf. H. L. Green Co. v. Childree, 185 F.Supp. 95 (S.D.N.Y. 1960) (Accountants allegedly induced corporation to go through with a merger (a securities transaction) by preparing false financial statements and making other misrepresentations).
 
 
 227
 A corporation may itself violate Rule 10b-5 if it engages in fraudulent activities in connection with a merger or other transaction involving securities. See Freed v. Szabo Food Service, Inc., '61-'64 CCH Fed.Sec.L.Rep. P91,317 (N.D.Ill. 1964) (Corporation, as part of a campaign to boost the value of its stock to achieve stockholder approval of a merger, deliberately issued statements misrepresenting future combined earnings. The price went up and the shareholders were impressed with this indication of the opinion of the financial community as to the proposed merger. The plaintiffs were held to have stated a cause of action under 10b-5 because they allegedly bought stock in the combined company on the strength of those misrepresentations.); cf. Vine v. Beneficial Finance Co., 374 F.2d 627 (2d Cir. 1967) (Corporation fraudulently arranged a merger so that one class of shareholders would receive much less than the other class which was comprised of officers and directors. While the alleged fraudulent acts were committed before plaintiff sold his stock (he had not at the time of suit), he was about to be forced to sell his part of a single fraudulent scheme.).
 
 
 228
 Another series of decisions involve a broker, dealer or financial institution which fraudulently induced plaintiff's purchase or sale. See Stockwell v. Reynolds & Co., 252 F.Supp. 215 (S.D.N.Y. 1965) (Plaintiffs retained stock in a company solely because a broker misrepresented or failed to disclose certain material facts.); Glickman v. Schweickart & Co., 242 F.Supp. 670 (S.D.N.Y. 1965) (Broker induced plaintiff to purchase some stock and to finance the pruchase through a factor without disclosing material facts concerning the risks of such a procedure.); Cooper v. North Jersey Trust Co., 226 F.Supp. 972 (S.D.N.Y. 1964) (Trust company alleged to be a participant in a fraudulent scheme whereby loans were made to plaintiff by a factor who converted the stock when it was pledged as collateral for the loan.); Meisel v. Noth Jersey Trust Co., 218 F.Supp. 274 (S.D.N.Y. 1963) (same); Lorenz v. Watson, 258 F.Supp. 724 (E.D.Pa.1966) (Brokerage house liable to plaintiff it it failed to supervise adequately one of its employees who allegedly was guilty of 'churning' or excessive turnover in plaintiff's account.). See also 9(a)(4), 15(c)(1), (2), 15 U.S.C. 78i(a)(4); 78o(c)(1), (2). In all of the above cases the defendants, unlike the defendant here, were clearly participants in a securities transaction and were guilty of or responsible for deceptive activities of which the securities transaction was an integral part.
 
 The Injunction Remedy
 
 229
 The remedy of a permanent injunction against the company, its officers and agents, the issuance of which the majority leaves to the discretion of the trial court, would not only be inappropriate but would be destructive of fundamental rights-- 'inappropriate' because based upon one 'too-gloomy' press release on April 12, 1964, with no proof of continuing gloominess thereafter. The issuance of any injunction over four years after the alleged violation would place a large company and its many executive employees under the possibility, without even a Miranda warning, that anything they say may be held against them and place them under the danger of criminal sanctions; 'destructive of fundamental rights' because the restraint constitutes not 'double' jeopardy but 'perpetual' jeopardy. If, as the majority say, the test of the news release is its impact on the 'reasonable' investor (although they indicate that the unreasonable speculator, too, comes under their solicitous wing) to avoid the danger of injunction violation it would be necessary to seek a declaratory judgment from the courts (both trial and appellate because following the majority, Rule 52(a) would no longer apply). As to the sufficiency of the news release, the first issue would be what constitutes a 'reasonable' investor. After the court had made a preliminary finding of reasonableness, these investors could then testify as to the impact that the proposed release would have on them. Query, as to whether twelve witnesses (akin to a jury) should be required-- and would a seven-to-five count be acceptable or would ten-to-two more accurately reflect public opinion? Other situations and problems of an equally reductio ad absurdum character can easily be conjured up. They would only point more directly to the conclusion that an injunction here would not only violate fundamental legal principles which for centuries have restricted the injunctive grant but would not be justified by any sufficient factual showing in this case. No clear and present danger, no continuing wrongful acts and no likelihood thereof are to be found in the record before this court.
 
 Crawford, Clayton and Coates
 
 230
 Since I believe that the findings of the trial court are solidly founded and should be respected, I agree with its decision as to Crawford and Clayton. I agree with the majority as to Coates because for all practical purposed the information had not become public at the time of his purchase order.
 
 Conclusion
 
 231
 In summary, the most disturbing aspect of the majority opinion is its utterly unrealistic approach to the problem of the corporate press release. If corporations were literally to follow its implications, every press release would have to have the same SEC clearance as a prospectus. Even this procedure would not suffice if future events should prove the facts to have been over or understated-- or too gloomy or optimistic-- because the courts will always be ready and available to substitute their judgment for that of the business executives responsible therefor. But vulnerable as the news release may be, what of the many daily developments in the Research and Development departments of giant corporations. When and how are promising results to be disclosed. if they are not disclosed, the corporation is concealing information; if disclosed and hoped-for results do not materialize, there will always be those with the advantage of hindsight to brand them as false or misleading. Nor is it consonant with reality to suggest, as does the majority, that corporate executives may be motivated in accepting employment by the opportunity to make 'secret corporate compensation * * * derived at the expense of the uninformed public.' Such thoughts can only arise from unfounded speculative imagination. And finally there is the sardonic anomaly that the very members of society which Congress has charged the SEC with protecting, i.e., the stockholders, will be the real victims of its misdirected zeal. May the Future, the Congress or possibly the SEC itself be able to bring some semblance of order by means of workable rules and regulations in this field so that the corporations and their stockholders may not be subjected to countless lawsuits at the whim of every purchaser, seller or potential purchaser who may claim he would have acted or refrained from acting had a news release been more comprehensive, less comprehensive or had it been adequately published in the news media of the 50 States.
 
 
 
 [1]
 Pursuant to a stipulation by all parties, the question of the appropriate remedies to be applied was deferred pending a final determination whether the defendants or any of them had violated Section 10(b) and Rule 10b-5 and therefore that question is not now before us
 
 
 [2]
 The purchases by the parties during this period were:
 
 
 [3]
 A 'call' is a negotiable option contract by which the bearer has the right to buy from the writer of the contract a certain number of shares of a particular stock at a fixed price on or before a certain agreed-upon date
 
 
 [4]
 The purchases made by 'tippees' during this period were:
 In this connection, we point out that, though several of the Holyk purchases of shares and calls made between November 29, 1963 and March 30, 1964 were in the name of Mrs. Holyk or were in the names of both spouses, we have treated these purchases as if made in the name of defendant Holyk alone.
 Defendant Mollison purchased 100 shares on November 15 in his name only and on April 8 100 shares were purchased in the name of Mrs. Mollison. We have made no distinction between those purchases.
 Defendant Crawford ordered 300 shares about midnight on April 15 and 300 more shares the following morning, to be purchased for himself, and his wife, and these purchases are treated as having been made by the defendant Crawford.
 In these particulars we have followed the lead of the court below. See the table at 258 F.Supp. 273-275 and the special references to the Holyk purchases at 273, and the Crawford purchases at 287. It would be unrealistic to include any of these purchases as having been made by other than the defendants, and unrealistic to include them as having been made by members of the general public receiving "tips" from insiders.
 
 
 [5]
 258 F.Supp. 262 (SDNY 1966)
 
 
 [6]
 Defendant O'Neill did not appear to answer the charge against him; the SEC motion to enter a default judgment against him was denied without prejudice to its renewal upon completion of this appeal
 Shortly after the appeal was argued defendant Lamont passed away, and by agreement of the parties an order was entered discontinuing his appeal and directing that the judgment below dismissing the action against him be severed from the judgment as to the other defendants.
 The SEC does not contest the alternative holding below that Holyk and Mollison, not being members of TGS's top management, had no duty of disclosure prior to acceptance of stock options.
 
 
 [7]
 Mollison had returned to the United States for the weekend. Friday morning, April 10, he had been on the Kidd tract 'and had been advised by defendant Holyk as to the drilling results to 7:00 p.m. on April 10. At that time drill holes K-55-1, K-55-3 and K-55-4 had been completed; drilling of K-55-5 had started on Section 2200 S and had been drilled to 97 feet, encountering mineralization on the last 42 feet; and drilling of K-55-6 had been started on Section 2400 S and had been drilled to 569 feet, encountering mineralization over the last 127 feet.' Id. at 294
 
 
 [8]
 15 U.S.C. 78j reads in pertinent part as follows:
 78j. Manipulative and deceptive devices
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the publicinterest or for the protection of investors.
 
 
 [9]
 Congress intended by the Exchange Act to eliminate the idea that the use of inside information for personal advantage was a normal emolument of corporate office. See Sections 2 and 16 of the Act; H.R.Rep.No. 1383, 73rd Cong., 2d Sess. 13 (1934); S.Rep.No. 792, 73rd Cong., 2d Sess. 9 (1934); S.E.C., Tenth Annual Report 50 (1944). See Cady, Roberts, supra at 912
 
 
 [10]
 The House of Representatives committee that reported out the bill which eventually became the Act did so with the observation that 'no investor, no speculator, can safely buy and sell securities upon exchanges without having an intelligent basis for forming his judgment as to the value of the securities he buys or sells.' H.R.Rep.No. 1383, 73d Cong., 2d Sess. (1934), p. 11
 Dr. Bellemore, the Texas Gulf defendants' expert witness, has written: 'The intelligent speculator assumes that facts are available for a thorough analysis. The speculator then examines the facts to discover and evaluate the risks that are present. He then balances these risks against the apparent opportunities for capital gains and makes his decision accordingly. He is, to the best of his ability, taking calculated risks.' Bellemore, Investments: Principles, Practices and Analysis 4 (2d ed.1962).
 
 
 [11]
 We are not, of course, bound by the trial court's determination as to materiality unless we find it 'clearly erroneous' for that standard of appellate review is applicable only to issues of basic fact and not to issues of ultimate fact. See Baranow v. Gibraltar Factors Corp., 366 F.2d 584, 587 (2 Cir. 1966); Mamiye Bros. v. Barber S.S. Lines, Inc., 360 F.2d 774, 776-778 (2 Cir.), cert. denied, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966); see also SEC v. R.A. Holman & Co., 366 F.2d 456, 457-458 (2 Cir. 1966) (by implication)
 
 
 [12]
 We do not suggest that material facts must be disclosed immediately; the timing of disclosure is a matter for the business judgment of the corporate officers entrusted with the management of the corporation within the affirmative disclosure requirements promulgated by the exchanges and by the SEC. Here, a valuable corporate purpose was served by delaying the publication of the K-55-1 discovery. We do intend to convey, however, that where a corporate purpose is thus served by withholding the news of a material fact, those persons who are thus quite properly true to their corporate trust must not during the period of non-disclosure deal personally in the corporation's securities or give to outsiders confidential information not generally available to all the corporations' stockholders and to the public at large
 
 
 [13]
 The April 16th article in The Northern Miner resulted from the reporter's April 13th visit to the drill site where he interviewed defendants Mollison, Holyk and Darke and looked at records of the drilling to that time. The text of the article was approved by Mollison in Timmins on April 15th. The first five paragraphs read as follows:
 Should Make Substantial Open Pit Operation TEXAS GULF SULPHUR COMES UP WITH A 'MAJOR' See Big Tonnages Of Base Metals, Plus Silver
 Texas Gulf Sulphur has chalked up a brilliant exploration success in its field program north of the Porcupine area. Following a visit to the discovery property, The Northern Miner can say that a major new zinc-copper-silver mine is definitely in the making, one that has all the earmarks of shaping into a substantial open pit operation.
 Only a relative handful of holes has been completed since the discovery hole but on the basis of seven tests either completed or drilling it can be stated that a strike length of 600 ft. minimum has been established, showing an ore width of roughly 300 ft. which has been traced so far to a maximum vertical depth of about 800 ft.
 So recent has been the discovery, and so urgent the effort to accelerate the drill program (four machines have been moved in since the discovery hole was completed), that assays have been completed on only the discovery. But this must be recorded as one of the most impressive drill holes completed in modern times.
 For a core length of a shade better than 600 ft., the hole averaged in excess of 1% Copper, 8% Zinc and nearly four ounces of silver.
 And there are impressive, strong sections within this width which in themselves are quite spectacular. In the upper part of the hole, for example, a core length of 82 ft. ran 7.1% Copper, 9.7% Zinc and 2.4 ozs. silver. This was followed by continuous values of ore tenor-- deeper down, a 100-ft. section runs 0.33% Copper, 0.8% Lead, 14.3% Zinc and 4.2 ozs. silver. And still deeper, a strong zinc section of better than 100 ft. averaged out to in excess of seven ounces of silver in addition to ore-grade zinc values.
 
 
 [14]
 The trial court found that defendant Murray 'had no detailed knowledge as to the work' on the Kidd-55 segment. There is no evidence in the record suggesting that Murray purchased his stock on January 8, 1964, on the basis of material undisclosed information, and the disposition below is undisturbed as to him
 
 
 [15]
 Even if insiders were in fact ignorant of the broad scope of the Rule and acted pursuant to a mistaken belief as to the applicable law such an ignorance does not insulate them from the consequences of their acts. Tager v. SEC, 344 F.2d 5, 8 (2 Cir. 1965)
 
 
 [16]
 Judges Waterman and Anderson, believing that there had been no definitive finding below as to whether Darke, expressly or by implication, transmitted to these outsiders any indication of the extremely favorable results of the drilling operation in which he was engaged, would remand for a determination on this issue, and if it should be determined that Darke did make such revelations, for a determination of the appropriate remedy
 
 
 [17]
 The effective protection of the public from insider exploitation of advance notice of material information requires that the time that an insider places an order, rather than the time of its ultimate execution, be determinative for Rule 10b-5 purposes. Otherwise, insiders would be able to 'beat the news,' cf. Fleischer, supra, 51 Va.L.Rev. at 1291, by requesting in advance that their orders be executed immediately after the dissemination of a major news release but before outsiders could act on the release. Thus it is immaterial whether Crawford's orders were executed before or after the announcement was made in Canada (9:40 A.M., April 16) or in the United States (10:00 A.M.) or whether Coates's order was executed before or after the news appeared over the Merrill Lynch (10:29 A.M.) or Dow Jones (10:54 A.M.) wires
 
 
 [18]
 Although the only insider who acted after the news appeared over the Dow Jones broad tape is not an appellant and therefore we need not discuss the necessity of considering the advisability of a 'reasonable waiting period' during which outsiders may absorb and evaluate disclosures, we note in passing that, where the news is of a sort which is not readily translatable into investment action, insiders may not take advantage of their advance opportunity to evaluate the information by acting immediately upon dissemination. In any event, the permissible timing of insider transactions after disclosures of various sorts is one of the many areas of expertise for appropriate exercise of the SEC's rule-making power, which we hope will be utilized in the future to provide some predictability of certainty for the business community
 
 
 [19]
 The record reveals that news usually appears on the Dow Jones broad tape 2-3 minutes after the reporter completes dictation. Here, assuming that the Dow Jones reporter left the press confernce as early as possible, 10:10 A.M., the 10-15 minute release (which took at least that long to dicatate) could not have appeared on the wire before 10:22, and for other reasons unknown to us did not appear until 10:54. Indeed, even the abbreviated version of the release reported by Merrill Lynch over its private wire did not appear until 10:29. Coates, however, placed his call no later than 10:20
 
 
 [20]
 The SEC seeks permanent injunctions restraining future proscribed activity by all the individual defendants and the corporation. The Commission also seeks court orders upon certain of the individual defendants that are essentially remedies of a private, rather than of a regulatory nature, court orders designed to have those individual defendants disgorge any profits they enjoyed from TGS stock transactions they or their 'tippees' engaged in from November 12, 1963 to April 17, 1964
 
 
 [21]
 Even at common law, the essentially private remedy of rescission which is sought here does not require more than a showing of negligence and frequently even less than that, see Restatement, Contracts, 476, comm. b (1932); and the common law concept of constructive fraud still available to private plaintiffs, see Trussell v. United Underwriters, Ltd., 228 F.Supp. 757, 772 (D.Colo. 1964), has been expanded from recklessness, see Prosser, Torts, 102, pp. 715-17 (3d ed. 1964), to include non-reckless negligent misrepresentations or omissions, see Note, 63 Mich.L.Rev. 1070, 1079
 
 
 [22]
 Liability under 12(2) of the Securities Act of 1933, 15 U.S.C. 77l(2), the language of which is strikingly similar to that of 10b-5(2), attaches from the mere fact of misrepresentation or misleading omission unless defendant proves that 'he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission.' The provisions of Sections 17(a)(2) and (3) of the Securities Act of 1933, 15 U.S.C. 77q(a)(2) and (3), which are virtually identical to the provisions of Rule 10b-5(2) and (3) and were, in fact, the model therefor, see Birnbaum v. Newport Steel Corp., 193 F.2d 461, 463 (2 Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952); Hooper v. Mountain States Sec. Corp., 282 F.2d 195, 201 n. 4 (5 Cir. 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961), apply criminal penalties to sellers only (Rule 10b-5 was promulgated to fill this gap in enforcement, SEC Ann.Rep. 10 (1942)), and have been read, upon close scrutiny of their legislative history, as not requiring specific fraudulent intent, SEC v. Van Horn, 371 F.2d 181, at 184-186 (7 Cir. 1966); United States v. Schaefer, 299 F.2d 625, 629 (7 Cir. 1962) (lack of diligence is all that is required for conviction in a criminal prosecution for violation of 17(a) of the 1933 Act.)
 
 
 [23]
 Coates's violations encompass not only his own purchases but also the purchases by his son-in-law and the customers of his son-in-law, to whom the material information was passed. See footnote 16, supra
 
 
 [24]
 The options granted on February 20, 1964 to Mollison, Holyk, and Kline were ratified by the Texas Gulf directors on July 15, 1965 after there had been, of course, a full disclosure and after this action had been commenced. However, the ratification is irrelevant here, for we would hold with the district court that a member of top management, as was Kline, is required, before accepting a stock option, to disclose material inside information which, if disclosed, might affect the price of the stock during the period when the accepted option could be exercised. Kline had known since November 1962 that K-55-1 had been drilled, that the drilling had intersected a sulphide body containing copper and zinc, and TGS desired to acquire adjacent property
 Of course, if any of the five knowledgeable defendants had rejected his option there might well have been speculation as to the reason for the rejection. Therefore, in a case where disclosure to the grantors of an option would seriously jeopardize corporate security, it could well be desirable, in order to protect a corporation from selling securities to insiders who are in a position to appreciate their true worth at a price which may not accurately reflect the true value of the securities and at the same time to preserve when necessary the secrecy of corporate activity, not to require that an insider possessed of undisclosed material information reject the offer of a stock option, but only to require that he abstain from exercising it until such time as there shall have been a full disclosure and, after the full disclosure, a ratification such as was voted here. However, as this suggestion was not presented to us, we do not consider it or make any determination with reference to it.
 
 
 [25]
 Rule 10b-5(2) provides in pertinent part:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, * * * (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, * * * in connection with the purchase or sale of any security.
 
 
 [26]
 The prayer for relief reads:
 WHEREFORE the plaintiff prays for:
 (5) The issuance of a final judgment permanently enjoining the defendant Texas Gulf from directly or indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of securities, making any untrue statement of material fact or omitting to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, namely, from issuing, publishing, distributing or otherwise disseminating materially false, misleading, inadequate or inaccurate press releases and other communications and reports concerning material facts about Texas Gulf's activities and operations.
 
 
 [27]
 See the discussion in footnotes 20, 21, and 22, supra, and in the accompanying text, dispensing with a fraudulent intent requirement in actions based on clause (3) of Rule 10b-5
 
 
 [28]
 Examined in retrospect, the situation in Timmins at the time the release was prepared seems to offer good reason for optimism. The draftsmen of the release had full knowledge of the discoveries up to 7:00 P.M. on Friday, April 10. At that time approximately 2/3 of the ore ultimately found to exist by the time of the preparation of the April 16 'major strike' release had been discovered by 5 holes placed so as to indicate continuity of mineralization within the large anomaly. As of that time SEC experts estimated ore reserves of over 8 million tons at a gross assay value (excluding costs) of over $26 a ton. Accepting the conservative view of TGS's expert Wiles that 95.2% Would be absorbed by costs, the ultimate profit could then have been estimated at more than $14,000,000. TGS experts could name very few base metal mines with a greater assay value and the court observed that bodies of much lower assay value were commercially mined, 258 F.Supp. at 282 n. 10. Roche, a mining stock specialist, added that mines with significantly lower percentages of copper and with no zinc or silver , as here, were profitably operated. On the basis of approximately one-third more data, and, for all the record shows, without any additional figures as to estimated costs, TGS announced on April 16 a major strike with over 25 million tons of ore. The trial court found that as of 7:00 P.M. on Thursday, April 9, 'There was real evidence that a body of commercially mineable ore might exist.' 252 F.Supp. at 282. And, by 7:00 A.M. on Sunday, April 10, eight hours before the release was issued to the press, 77.9% Of the drilling in mineralization had been completed, 84.4% By 7:00 P.M. on the 12th, and 90.2% By 7 A.M. on April 13. The release did not appear in most newspapers of general circulation until later in the morning of Monday, the 13th
 The release, see p. 845, supra, began by referring to rumored reports that the company had made a substantial copper discovery and then continued: 'These reports exaggerate the scale of operations, and mention plans and statistics of size and grade of ore that are without factual basis and have evidently originated by speculation of people not connected with TGS.' It then stated, purporting to give the true facts in contradiction ot the rumors: 'The facts are as follows.' However, the 'facts' disclosed relative to the Kidd-55 segment were: 'Recent drilling on one property near Timmins has led to preliminary indications dications that more drilling would be required for proper evaluation of this prospect. The drilling done to date has not been conclusive but the statements made by many outside quarters are unreliable.' It was then said that, as of April 12, the release date, '* * * any statement as to size and grade of ore would be premature and possibly misleading.' A definite statement 'to clarify' was promised in the future.
 
 
 [1]
 Since none of the parties has raised the question, I assume the continuing vitality of Ruckle, despite what have been regarded as contrary intimations in O'Neill v. Maytag, 339 F.2d 764 (2 Cir. 1964), a decision that has not found favor with other circuits. Cf. Dasho v. Susquehanna Corp., 380 F.2d 262 (7 Cir.), cert. denied, Bard v. Dasho, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470 (1967); Pappas v. Moss, 393 F.2d 865 (3 Cir. 1968); see Jennings, Insider Trading in Corporate Securities: A Survey of Hazards and Disclosure Obligations under Rule 10b-5, 62 Nw.U.L.Rev. 809, 830-33 (1968). If we were writing on a clean slate, I would have some doubt whether the framers of the Securities Exchange Act intended 10b to provide a remedy for an evil that had long been effectively handled by derivative actions for waste of corporate assets under state law simply because in a particular case the waste took the form of a sale of securities. We will shortly be exploring this issue in the in banc consideration of Schoenbaum v. Firstbrook, 2 Cir., 405 F.2d 215
 
 
 [2]
 Though the Board of Directors of TGS ratified the issuance of the options after the Timmins discovery had been fully publicized, it obviously was of the belief that Kline had committed no serious wrong in remaining silent. Throughout this litigation TGS has supported the legality of the actions of all the defendants-- the company's counsel having represented, among others, Stephens, Fogerty and Kline. Consequently, I agree with the majority in giving the Board's action no weight here. If a fraud of this kind may ever be cured by ratification, compare Continental Securities Co. v. Belmont, 206 N.Y. 7, 99 N.E. 138, 51 L.R.A., N.S., 112 (1912), with Claman v. Robertson, 164 Ohio St. 61, 128 N.E.2d 429 (1955); cf. Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), that cannot be done without an appreciation of the illegality of the conduct proposed to be excused, cf. United Hotels Co. v. Mealey, 147 F.2d 816, 819 (2 Cir. 1945)
 
 
 [3]
 Of course, 12(1)'s imposition of a liability almost absolute upon the seller of a security that has not been registered in violation of 5 of the 1933 Act is grounded on distinctive concerns. See 3 Loss, Securities Regulation 1692-96 (1961)
 
 
 [4]
 The imposition of liability on Clayton, Crawford and Coates for 'beating the gun' does not require any such metamorphosis of Judge Frank's concept of fraud as the majority opinion seeks to perform. The only one of these defendants who came colse to a showing of good faith was Coates. But even he did not act on the belief that the second press release had in fact reached the market, see 258 F.Supp. at 288; his defense was rather a belief that the law required him only to await its issuance. While such an erroneous view of the law is pardonable, it is not 'good faith' in a legal sense
 
 
 [1]
 In re Cady, Roberts & Co., 40 SEC 907 (1961)
 
 
 [2]
 The New York Stock Exchange Company Manual provides:
 'Dealing with Rumors Affecting the Market: Occasions may also arise when rumors have been circulated which have no basis in fact or which require clarification or interpretation and which also result in unusual activity or price changes in a particular security. Under such circumstances, the most effective procedure is the quick and speedy denial of such rumors through a release to the public Press * * *'
 
 
 [3]
 Of course, even if TGS were negligent in not obtaining later data, a determination must still be made that the press release was misleading in light of this later information
 
 
 [4]
 Whether the release had any such effect would, of course, be irrelevant
 
 
 [5]
 Hearings before the House Committee on Interstate and Foreign Commerce on H.R. 7852 and H.R. 8720, 73rd Cong., 2d Sess. (1934)
 
 
 [6]
 In two cases, on motions to dismiss, two courts have permitted 10b-5 actions to continue where defendants were not alleged to be intimately connected with a purchase or sale of securities. Miller v. Bargain City, U.S.A., 229 F.Supp. 33 (E.D.Pa.1964); Fischer v. Kletz, 266 F.Supp. 180 (S.D.N.Y.1967). But in both cases the courts recognized that further factual and legal development was necessary for the proper resolution of the issue